715 A.2d 228

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND
CROSS–APPELLANT, v. ROBERT W. MORTON, DEFEN-
DANT–APPELLANT AND CROSS–RESPONDENT.

Argued February 3, 1998—Decided July 30, 1998.

388

390

394

*Susan C. Green* and *Bernadette N. DeCastro*, Assistant Deputy Public Defenders, argued the cause for appellant and cross-respondent (*Ivelisse Torres*, Public Defender, attorney).

*Lisa Sarnoff Gochman*, Deputy Attorney General, argued the cause for respondent and cross-appellant (*Peter Verniero*, Attorney General of New Jersey, attorney).

POLLOCK, J.

Defendant, Robert Morton, appeals directly from his conviction of purposeful-or-knowing murder by his own conduct and related offenses. *R.* 2:2–1(a)(3). The capital conviction arose from the robbery and stabbing murder on February 23, 1993, of Michael Eck, a gas station attendant. The jury sentenced defendant to death. We affirm.

## I. *Facts*

In two separate events during the night of February 23–24, 1993, two assailants attacked Toby Chrostowski and Michael Eck. Chrostowski, who was stabbed once in the chest, survived. Eck, who sustained a total of twenty-four stab wounds, died.

### A. *Chrostowski Stabbing*

At approximately 10:20 p.m. on February 23, Chrostowski drove his BMW automobile into the parking lot of the Playhouse, a go-go bar in Burlington Township. Chrostowski, who had arranged to meet a co-worker, Brian Land, parked in front of Land's car. He noticed two men staring at him from a Ford Escort parked next to Land's car. Chrostowski exited his car and walked toward the

bar. His path required him to pass between Land's car and the Ford.

As Chrostowski walked between the cars, the driver of the Ford stepped into Chrostowski's path. At the same time, the passenger walked around the car and approached Chrostowski from behind. Chrostowski tried to walk past the driver. He felt a sharp pain in his chest, but continued into the bar. On entering the bar, Chrostowski discovered that he was bleeding from a stab wound.

He described his attackers as black males, both of whom were wearing jackets. The shorter of the two men was wearing gold-framed glasses and a "different" kind of hat. Chrostowski's descriptions matched those of two men who had just been ejected from the Playhouse for unruly behavior. Chrostowski did not know which of the two men had stabbed him.

## B. *Eck Stabbing*

In the early morning of February 24, approximately two hours after the Chrostowski stabbing, James Sireci, a limousine driver, was buying gas at the Amoco station in Delran. The attendant pumping gas was Michael Eck. Sireci saw a maroon Ford Escort pull into the station and stop by an air pump. No one, however, left the Ford. After paying Eck, Sireci noticed that the Ford was backing toward his limousine. Because the Ford almost hit the limousine, Sireci stared at the occupants. The driver was a dark-complexioned male with a mustache, who was wearing a black wool cap with a rolled-up brim. The passenger was a light-complexioned black male with closely cropped hair. Sireci then drove from the station.

Soon after, a 9–1–1 emergency dispatcher received a call from a public phone located at the Delran Amoco. The caller, who was gasping for breath, twice said "Delanco Amoco," but nothing else. By chance, Officer Charles Reynolds of the Delran Township Police Department, who had just completed his shift, arrived at the Delran Amoco to purchase cigarettes. On entering the attendant's office, he saw Michael Eck lying face up on the floor.

The telephone was dangling off its hook. As Officer Reynolds knelt besides him, Eck said that he had been stabbed in the arm, groin, and chest. Eck's shirt and pants were torn and stained with blood. Although Eck was having difficulty breathing, he told Officer Reynolds that he had been stabbed by two young black men. The men were driving a "Gremlin" style vehicle, which appeared under the station's fluorescent lights to be tan in color.

At approximately 12:25 a.m., emergency medical technicians arrived at the Delran Amoco. They gave Eck oxygen and applied pressure bandages to his stab wounds. They transported Eck to Memorial Hospital, where he died. The immediate cause of his death was a stab wound to his heart.

## C. *The Investigation*

At approximately 1:05 a.m. on February 24, Officer William Zielinski went to the emergency room of the Rancocas Valley Hospital in response to a call regarding a patient with a knife wound. The patient was defendant. As Officer Zielinski entered the hospital, he passed Alonzo Bryant, who was leaving. Despite the subfreezing temperature, Bryant was not wearing a coat.

Inside the hospital, Nurse Mary Costello Armstrong explained that defendant had arrived with Bryant and was suffering from a spiral laceration on his left index finger. Although Bryant had told her that a broken bottle caused the cut, Nurse Armstrong recognized it as a knife wound. She believed that defendant was lying and suspected his injury was related to the stabbing of Chrostowski, whom she had treated earlier in the evening.

Officer Zielinski interviewed defendant, whom he described as a short, stocky, black male wearing gold-rimmed glasses and a short-sleeved shirt. Defendant was not wearing a coat. He said that a stranger had injured him at a bar in Trenton, but did not know the name or location of the bar. Defendant also declined Officer Zielinski's offer to pursue further legal action against his assailant. Officer David Barnes, who arrived at the hospital to serve as a backup, described defendant's demeanor as curt and

evasive. When Detective Dean Potts of the Delran Police Department arrived, defendant repeated that he had been injured by an unknown assailant at an unnamed Trenton bar.

Defendant left the hospital accompanied by two women. Detective Potts followed them in his patrol car as they left on foot. Defendant wore only a short-sleeved shirt. On noticing that a police car was following them, defendant and his companions began to run. Detective Potts followed them until they entered a Burlington apartment complex.

In the afternoon of February 24, Frances Robinson and Paula Palmo–Reeves, who were exotic dancers at the Playhouse, along with their manager and a Playhouse bouncer, met with a police sketch artist. The purpose of the meeting was to obtain a description of the two men who had been ejected from the bar just before Chrostowski's stabbing. The two women described one man as a short, stocky, black male who wore gold-rimmed glasses and a fishing-style Raiders hat. The other man was a taller, thinner black male, whose conduct had caused both men to be ejected from the bar.

Later that evening, Robinson was driving on Route 130 with her boyfriend, Brian Land, when she noticed defendant driving alongside in his maroon Ford Escort. She recognized defendant as the short, stocky male who had been in the Playhouse the previous night. Defendant again was wearing gold-rimmed glasses and his Raiders fishing hat. Land called the police on his car phone, and Robinson described defendant and his car. Robinson also gave the police a partial license plate number and said that defendant had turned off Route 130 into the Edgewater Park McDonald's Restaurant.

Patrolman Robert Hess of the Edgewater Park Police Department went to McDonald's at 12:25 a.m. on February 25. He discovered that defendant's car was not listed in the police department's mobile data terminal information database, indicating that the car was either unregistered or stolen. While inspecting the car, defendant emerged from McDonald's wearing an employee

uniform. When asked by Patrolman Hess for his name and address, defendant gave his name as Robert Moore, gave his aunt's phone number and address as his own, and admitted that he owned the car. Patrolman Hess reported the information to the Burlington City Police Department.

On that same morning, Beverly Cuffie called the Willingboro Police to report that her daughter, Vicky Williams, knew something about the Amoco station robbery. Officer David Barnes went to Cuffie's apartment to interview Williams. Also present was Bernard Harper, who was both Williams's boyfriend and Bryant's brother. Williams explained that Bryant's girlfriend, Annie Edwards, had called her with information about the robbery. According to Williams, Edwards said that, in the early morning of February 24, Bryant and defendant arrived at her apartment. They told her that they had robbed a gas station and stabbed the attendant. Harper explained that he too knew of defendant's and Bryant's activities. He went to the police station and gave a taped statement.

In the statement, Harper related that at 9:00 p.m. on February 23, defendant and Bryant drove him to Williams's apartment. At the time, defendant was wearing glasses and a Raiders fishing hat. Additionally, defendant and Bryant were wearing green surgical gloves, and both possessed knives. Bryant told Harper that he planned to "get somebody, kill somebody and get some money." Defendant and Bryant drove Harper to Williams's house and then to his aunt's house. Harper did not see either of them again until early the next morning when they returned to his aunt's house. At that time, defendant had blood on his jacket and a cut on his left hand. Bryant took defendant to Rancocas Valley Hospital. Sometime thereafter, Bryant called Harper to tell him that the police were interviewing defendant at the hospital, and to ask if the police had come to his aunt's house looking for them. When Harper saw Bryant later that day, Bryant said that he had done

something that he did not want to talk about. Bryant then gave Harper $25 from a "knot" of bills in Bryant's pocket.

Police also obtained statements from Annie Edwards, Bryant's girlfriend, and Carolyn Bennett, Edward's roommate. The two women explained that defendant and Bryant arrived at their apartment sometime after midnight on February 24. At the time, defendant was wearing a Raiders fishing hat and a blood-stained jacket. Defendant and Bryant went to the bathroom to treat a cut on defendant's finger. Thereafter, Bryant took four cartons of cigarettes from his jacket. He asked Edwards to count a blood-stained wad of money, which totaled approximately $200.

Sometime thereafter, Bryant returned to the apartment alone. He explained that he and defendant had robbed the Amoco station. While Bryant beat the victim, defendant stabbed him. At Bryant's request, the two women went to the hospital, where they observed defendant speaking with police officers.

When returning from the hospital, defendant told the women that he had cut his finger in a bar fight. The women, however, told defendant that Bryant had already told them about the gas station robbery. Defendant then admitted that he had cut himself when his knife folded back on his finger as he was stabbing Eck. Defendant related that he had stabbed Eck as Bryant beat him. Demonstrating how he had stabbed Eck, defendant said that he believed that they had killed Eck. He boasted that "there was one less cracker that he would have to worry about." The women understood the word "cracker" to mean a white person.

Back at the apartment, defendant and Bryant spoke of their plan to "hit either a bank or another gas station." They laughed and joked as they described Eck's murder. Bryant told the women that defendant had stabbed Eck in the genitals, a statement defendant did not deny. According to Bryant, Eck called him "nigger" while being beaten and stabbed. Finally, Bryant said defendant had stabbed Eck with his knife. Bryant then disposed of defendant's knife by throwing it somewhere between

Cinnaminson and Willingboro. While at the house, Bryant placed defendant's bloody jacket in the washing machine.

Based on this information, Police Captain Michael King decided to arrest defendant and Bryant for the murder of Michael Eck. At 11:00 a.m. on February 25, the Burlington Police stopped defendant as he was driving his Ford Escort. After arresting defendant, the police towed away defendant's car.

### D. *Defendant's Interview*

At the Prosecutor's Office, Captain King advised defendant of his *Miranda* rights and asked him to read and sign a warning card. *See Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L. Ed.*2d 694 (1966). After answering questions regarding his unregistered car, defendant stated his belief that the officers were interviewing him for something more than a motor vehicle offense. Specifically, defendant stated, "You think I killed somebody in Delran? This is just a cut on my hand." Until that point, no one had mentioned Eck's murder. Defendant answered questions regarding his friendship with Bryant, but maintained that he was not involved in the Amoco robbery. Because of this assertion, Captain King informed defendant he was ending the interview. As Captain King prepared to leave, defendant grabbed King's arm and said, "I know you want to get to the nitty-gritty. I was there with Alonzo in Delran when he did what he did. I know it was a bad move. I know I'm done. I'm going to jail." Defendant then agreed to make a tape-recorded statement regarding the events of February 23 and 24.

### 1. *Defendant's First Statement*

In his first statement, defendant acknowledged the attacks on both Chrostowski and Eck, but identified Bryant as the aggressor. In this statement, defendant explained that on leaving the "Doll House" bar and entering his car, Bryant decided to "roll" Chrostowski, who had just parked his BMW near defendant's car. As defendant opened his door, Bryant walked around the car and

stabbed Chrostowski. When asked why he had opened his door, defendant explained, "I was going to be an accessory to that bad boy ... even though I knew it was wrong." After stabbing Chrostowski, Bryant and defendant were distracted by the sound of sirens. Defendant and Bryant then went to an unnamed club in Trenton, where defendant got into an altercation with another patron. Next, they proceeded to Francine's, a Cherry Hill nightclub. On arrival, however, Bryant decided not to enter the club.

After leaving Francine's, they approached the Delran Amoco station. Bryant instructed defendant to pull into the station. Defendant agreed because he needed gas. Defendant saw a limousine parked at one of the three rows of gas pumps, and decided to park his car by the air pump to put air in his tire. After placing air in his tire, defendant drove to the gas pumps, at which point the attendant came to assist him. Bryant immediately jumped out of the car and began stabbing the attendant. Defendant claimed he had tried to stop Bryant by grabbing Bryant's knife, thereby cutting his own finger. The attendant begged Bryant to stop, and told them that they could take anything they wanted. Bryant, however, continued to stab the attendant "like a piñata" to make sure he was penetrating the attendant's thick winter coat. Bryant later explained to defendant that he killed the attendant because he did not want to leave any witnesses. After stabbing the attendant, Bryant went into the station building and took some cartons of cigarettes.

## 2. *Defendant's Second Statement*

After reviewing his first statement, defendant said, "This is not coming out right. The jury will never believe me.... This sounds bad. I did enough lying to cover it up. I'm tired of lying." Captain King agreed with defendant that the first statement was incredible. To demonstrate his agreement, King cut up a blank tape, which defendant believed to be the tape of his statement. Defendant then proceeded to make a second statement, which

Captain King and Detective John Stefanoni again recorded. The material facts of defendant's second statement are as follows:

Early in the evening, Bryant asked defendant if he was "down on doing something," which involved not just going out, but "getting paid," which meant committing robberies. Defendant suggested that they wear surgical gloves so as not to leave any fingerprints. Defendant and Bryant unsuccessfully tried to purchase guns from neighborhood drug dealers. Instead, each armed himself with a knife. Defendant described his knife as "a regular seven-inch knife." Their plan was to go to the parking lots of some bars and clubs and rob wealthy-looking patrons as they left their cars.

Defendant stated, "I knew what I was getting into.... One indication of the night being a murderous night was when 'Lonzo cut a guy...." This statement was made in reference to the Chrostowski stabbing. Defendant explained that he and Bryant were in his car outside of the "Doll House" when they decided to "roll" Chrostowski. Defendant blamed himself for Chrostowski's escape, stating that he did not open his door in time to completely block Chrostowski's path. Although defendant said he "didn't touch" Chrostowski, he "sure to hell made up for that on that old man [Eck]."

Defendant and Bryant then decided to "hit" Francine's, a Cherry Hill nightclub. They targeted that club because of its wealthy clientele. A valet parking system at Francine's, however, foiled their plan. As defendant said he explained to Bryant, "We can't roll nobody here because we will have to kill a whole lot of motherfuckers ... you cannot do that with these motherfuckin' little fuckin' knives we got."

After leaving Francine's and returning to Burlington on Route 130, Bryant told defendant to pull into the Delran Amoco. Once there, they waited by the air pump until a limousine departed. When Eck approached their car, defendant and Bryant attacked him. Defendant stated:

Alonzo was out there before me. Alonzo had took the guy and was in there.... While he was getting cartons of cigarettes, I was stabbin' the man, too. And I can't give no accurate account who got the most stabs in and all that shit. This is only 'cause we was stabbing the guy.... I'm a fuckin' killer. I did it. I'm sorry but that don't bring the man back and due process get what I deserve.... Who am the fuck am I to take a man out that ain't did nuttin'.

While stabbing Eck, defendant's knife closed, penetrated his glove, and cut his left index finger.

Defendant repeated that, during the attack, Eck offered no resistance. Eck begged defendant and Bryant to leave him alone and told them to take all they wanted. When asked why he and Bryant continued to stab Eck, defendant stated:

You know what I wanted to do? Like I was telling you before, yeah. Don't have no witnesses around. Not torture him, dismiss him off ... off the planet.... We're acting like ... how can you put it? Somebody is working for an Italian family. They got a contract out and you gotta get ... kill a person. Like it's a bid. It's like it's a job. Like you have a job and everything to do. It's a job. That's how we actin'. Like this is all businesslike. Like emotional, it isn't that. Just taking somebody out.... No emotion.

After the attack, Bryant took a wad of money from Eck's front pocket, went into the station building, and took several cartons of cigarettes. Defendant, however, did not take anything. Defendant explained, "While [Alonzo] was in there, I didn't motherfuckin' take the money or nuttin'. I wasn't concerned about money. You know what I was concerned about? Huh? Making sure he's dead. Stabbed.... Because I didn't wanna motherfuckin' witness."

Defendant and Bryant left the gas station and went to Annie Edwards's house. Somewhere between Delran and Willingboro, defendant threw the surgical gloves from the car window. After arriving at Edward's house, defendant and Bryant bragged about the robbery. Bryant described how he had stabbed Eck in the genitals. Because defendant was still bleeding, Bryant took him to see Bryant's aunt, a nurse, at her apartment. On her suggestion, Bryant took defendant to the hospital. At some point during the evening, Bryant discarded defendant's knife. Defendant was annoyed that Bryant had thrown away defendant's knife, but cleaned and kept his own knife.

E. *The Recovery of the Surgical Gloves:*

On February 27, 1993, two days after defendant was interviewed, Lieutenant Patrick Edwardson of the Burlington County Police Department found two latex gloves on the shoulder of Route 130. The next day police recovered two more gloves alongside Route 130, approximately one-tenth of a mile from the scene of the murder.

Detective Edward Perrino of the Delran Township Police Department photographed the gloves and placed them in evidence envelopes. He took the gloves to the Delran Police Department, entered their recovery in an evidence log, and placed them in a locked evidence cabinet. On March 1, 1993, Detective Perrino delivered the gloves to Investigator James Bucks of the Burlington County Prosecutor's Office. Bucks stored the gloves in a locked evidence vault, which was protected by an alarm. Two days later, Bucks delivered the gloves to the Federal Bureau of Investigation lab in Washington, D.C. for DNA testing and fingerprint analysis. There, Special Agent John Mertens performed a DNA test on the gloves. The FBI then returned the gloves to the prosecutor's office by registered mail, in accordance with standard FBI procedure.

The test revealed that the DNA of the blood found on one of the gloves matched that of a blood sample taken from defendant. Based on the tests results, Mertens determined the probability that the blood on the glove was defendant's exceeded ninety-nine percent. During the same test, Mertens determined that the blood was not Bryant's. The glove, moreover, contained a cut on the inside of the index finger, matching the cut defendant received on his left index finger during the Eck stabbing. Mertens testified that the slit in the glove was not a result of the DNA testing. Additional DNA tests disclosed that Eck's blood caused other stains on the gloves. In sum, the test revealed the presence of defendant's and Eck's blood, but not Bryant's blood, on the gloves.

F. *The Trial*

On September 16, 1993, a Burlington County grand jury indicted defendant, in connection with the Eck stabbing, of purposeful murder by his own conduct, *N.J.S.A.* 2C:11–3a(1) & (2); felony murder, *N.J.S.A.* 2C:11–3a(3); first-degree robbery, *N.J.S.A.* 2C:15–1; and armed robbery, *N.J.S.A.* 2C:15–1a(1). In connection with the Chrostowski stabbing, the grand jury indicted defendant on charges of attempted murder, *N.J.S.A.* 2C:5–1 & 2C:11–3; armed robbery, *N.J.S.A.* 2C:15–1a(1); first-degree robbery, *N.J.S.A.* 2C:15–1; second-degree aggravated assault, *N.J.S.A.* 2C:12–1b(1); and third-degree aggravated assault, *N.J.S.A.* 2C:12–1b(2). Alonzo Bryant was similarly charged.

The Burlington County prosecutor's office served on defendant a notice of aggravating factors, alleging that the murder involved torture, depravity of mind, or an aggravated assault, *N.J.S.A.* 2C:11–3c(4)(c); the murder was committed for the purpose of escaping detection or apprehension for another offense, *N.J.S.A.* 2C:11–3c(4)(f); and that the murder took place in the course of a robbery, *N.J.S.A.* 2C:11–3c(4)(g).

Before trial, the court ruled on several motions. Without defendant present, the court denied motions to adjourn the proceedings to allow defendant to attend, to close the pretrial proceedings to the public, to dismiss the death counts, to dismiss the indictment, to exclude the victim's family from the proceedings, and to sever the counts of the indictment pertaining to the Chrostowski incident. In subsequent proceedings, the court denied defendant's request to compel the State to turn over the original tapes of defendant's statements so that defendant could test their authenticity. The court ordered redaction of the tapes, which it admitted into evidence at trial. The court denied defendant's motion to suppress his statements made at the time of arrest and before making the taped statements. The court held that the DNA evidence, which had been obtained from the recovered surgical gloves, was admissible.

From March 19, 1996 to May 31, 1996, the court impaneled a jury. The guilt phase took place from June 10, 1996 through June 26, 1996, at the conclusion of which the jury convicted defendant of all counts except for the attempted murder charge, on which it deadlocked.

Defendant, who had absented himself from part of the jury *voir dire* and during the guilt-phase deliberations, received the court's permission to be absent from the penalty-phase proceedings, which commenced on June 27, 1996. On July 1, 1996, the jury sentenced defendant to death for the purposeful and knowing murder by his own conduct of Michael Eck.

The jury found that the State had proven the "escape detection or apprehension," *N.J.S.A.* 2C:11–3c(4)(f), and "murder in the course of robbery," *N.J.S.A.* 2C:11–3c(4)(g), aggravating factors. It failed to determine by unanimous vote the existence of the "torture or depravity" aggravating factor, *N.J.S.A.* 2C:11–3c(4)(c), with ten jurors finding its existence and two jurors not finding its existence. By non-unanimous votes, the jury found five mitigating factors. One juror concluded that defendant would probably die in prison; three jurors found that defendant was Doris Morton's only child; seven jurors found that defendant had no prior criminal record; ten jurors found that defendant would not have committed the offense but for Bryant; and ten jurors concluded that defendant would not have participated in the offenses were it not for Bryant. The jurors concluded that the aggravating factors outweighed the mitigating factors. Defendant refused to be present in the courtroom for the announcement of the penalty-phase verdict.

In addition to his death sentence, defendant was sentenced to an aggregate non-capital sentence of forty years imprisonment with twenty years of parole ineligibility.

Defendant appealed, and the State cross-appealed.

## II. *Tapes*

In the Law Division, defendant challenged the authenticity of his two taped statements. The first statement, he contended, was

inaccurate and incomplete. He denied making the second statement.

During discovery, the State provided the defense with transcripts of the statements and copies of the tapes. Before trial, defendant moved for production of the original tapes to test their authenticity. His contention was that he needed the original tapes, not just copies, for testing. In support of this contention, defendant submitted an affidavit from Thomas J. Owen, an audio and voice identification expert. The defense offered to permit the State, if the original tapes were damaged, to admit copies at trial. Apart from a statement that "defendant submits that the tapes are not accurate and that they have been 'doctored,' " defendant offered no facts supporting his allegation of tampering and fabrication. The trial court, finding no rational basis to warrant testing, denied defendant's request. Indeed, the court characterized the defense motion as "solely a fishing expedition."

Defendant then moved to suppress the tapes. At the suppression hearing, defendant testified. He stated that the first tape omitted some of his answers and included others that he had not given. He denied making the second taped statement and claimed that it was a complete fabrication. After defendant testified, counsel renewed his motion for access to the original tapes. The court held, however, that the evidence did not support defendant's allegations of tampering. In reaching that holding, the court found defendant's testimony to be incredible.

During the guilt phase, the State admitted in evidence portions of the tapes. At the request of defense counsel, the trial court ordered the redaction of certain statements. The redacted portions of the tapes included defendant's statements that he wanted to die for his participation in the stabbing, his desire to kill anyone he encountered in prison, his threat that he would kill again, and his response regarding a stabbing incident occurring two months before Eck's murder. During summation, the State replayed a portion of defendant's redacted second statement.

The court rejected a defense request for an instruction that it had denied defendant's motion for the production of the original tapes. Before the guilt-phase summations, the prosecutor moved to preclude defense counsel from arguing that the State should have tested the tapes. In response, defense counsel represented that he would not mention on summation that the tapes had not been subject to authenticity testing.

Despite his representation, defense counsel in summation stated that the State could have sent the tapes to the FBI for testing, but had failed to do so. In response to the prosecutor's objection, the court provided the prosecutor with two options. First, the court offered to instruct the jury to disregard the challenged part of the defense summation. Alternatively, the court offered to permit the prosecutor to argue that defendant could have obtained the tapes to test their authenticity by submitting sufficient facts to establish "a rational basis for that kind of testing." The court reasoned that, although it had denied defendant's motion for access to the original tapes, defendant could have obtained the tapes if he had presented an adequate factual basis.

The prosecutor chose to respond to defense counsel's statements. Defendant now argues that the court's failure to inform the jury that it had denied his request for the original tapes, in conjunction with the prosecutor's summation, denied him a fair trial and due process.

A. *Authenticity*

██ We hold that the trial court did not err in denying defendant's motion to obtain the original tapes for authenticity testing. Under the Rules of Court, defendant is entitled to "records of statements or confessions, signed or unsigned, by the defendant or copies thereof." *R.* 3:13–3(c)(2). By producing copies of the tapes and transcripts, the State met its burden of production. *Ibid; see State v. Russo,* 127 *N.J.Super.* 286, 289, 317 *A.2d* 369 (App.Div. 1974) (holding State need not provide defendant with transcripts of tapes at its expense); *State v. Braeunig,* 122 *N.J.Super.* 319,

328–32, 300 *A*.2d 346 (App.Div.1973) (holding defendant is entitled to access to tapes for purpose of transcribing contents therein); *see also State v. Cook,* 43 *N.J.* 560, 565, 206 *A*.2d 359 (1965) ("[T]he ordinary procedure has been to give defendants copies of their own statements as a matter of course...."). Absent any showing of a factual basis supporting defendant's allegations of tampering and falsification, the State need not have turned over the original tapes for testing.

▮▮▮▮ Because we conclude that the State met its burden of production, we reject defendant's assertion that the prosecutor's failure to turn over the tapes constituted a violation of the rule of *Brady v. Maryland,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L. Ed.*2d 215 (1963). A *Brady* violation occurs when a prosecutor fails to turn over material, exculpatory evidence to the defendant. *See State v. Marshall,* 148 *N.J.* 89, 189, 690 *A*.2d 1 (1997) (*Marshall III*); *State v. Knight,* 145 *N.J.* 233, 246, 678 *A*.2d 642 (1996). Defendant argues that, by refusing to turn over the original tapes, the prosecution violated *Brady.* *Brady*'s focus, however, is on the nondisclosure of exculpatory evidence, not on challenges to the evidence's authenticity. *See Brady, supra,* 373 *U.S.* at 87, 83 *S.Ct.* at 1196–97 (finding constitutional violation in prosecutor's failure to notify defendant of existence of co-defendant's inculpatory statement); *see also Kyles v. Whitley,* 514 *U.S.* 419, 437–38, 115 *S.Ct.* 1555, 1567–68, 131 *L. Ed.*2d 490 (1995) (finding *Brady* violation when prosecutor failed to inform defendant of existence of exculpatory evidence).

The prosecution met its burden of disclosure by providing defendant with copies and transcripts of the taped confessions. Moreover, neither of these confessions were exculpatory. *See State v. DiFrisco,* 118 *N.J.* 253, 260, 571 *A*.2d 914 (1990) (*DiFrisco I*) (finding no *Brady* violation where undisclosed evidence was not exculpatory). Defendant's argument, that the original tapes, if altered, would constitute exculpatory evidence under *Brady,* is too attenuated. His challenge is directed at the authenticity, not the disclosure, of evidence. As such, defendant must provide more

than mere unfounded allegations of tampering to compel the prosecutor to turn over the original tapes for testing.

At the hearing on defendant's motion for production of the original tapes, the trial court found no factual basis supporting defendant's allegation that the tapes were altered or defective. Consequently, the court denied defendant's motion for production. Additionally, the court, after hearing defendant's allegations regarding the tapes at a suppression hearing, concluded that "his testimony in that regard [was] simply not credible." We do not perceive any reason to depart from traditional appellate deference to the trial court's assessment of the credibility of witnesses. *State v. Barone,* 147 *N.J.* 599, 615, 689 *A.*2d 132 (1997).

Defendant's allegations, moreover, consist of nothing more than bald assertions, which do not justify granting his request for possession of the original tapes. *Cf. State v. Young,* 242 *N.J.Super.* 467, 577 *A.*2d 520 (App.Div.1990) (refusing to require production of breathalyzer test ampules as part of discovery when there was no basis to believe such production would materially assist defendant's case). Captain King and Detective Stefanoni, who were present during the taping of the statements, denied defendant's claims that the tapes had been doctored and falsified. At trial, furthermore, both Williams and Bennett identified defendant's voice on both tapes. The trial court properly concluded that the jury could consider this evidence in making its determination regarding the authenticity of the tapes. *See State v. Gallagher,* 286 *N.J.Super.* 1, 18–19, 668 *A.*2d 55 (App.Div.1995), *certif. denied,* 146 *N.J.* 569, 683 *A.*2d 1164 (1996); *N.J.R.E.* 701; *see also U.S. v. Magana,* 118 *F.*3d 1173, 1209 (7th Cir.1997) (noting witness's identification of defendant's voice permissible when witness had previous opportunity to hear defendant's voice, albeit not necessarily during the commission of the crime), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 1104, 140 *L. Ed.*2d 158 (1998); *People v. Buchanon,* 186 *A.D.*2d 864, 588 *N.Y.S.*2d 933 (1992) (holding lay witness who knew defendant for fourteen years was competent to testify that defendant's voice was that on inculpatory

recording). Defendant's unsubstantiated allegations did not provide grounds for the court to exercise its "inherent power to order discovery when justice so requires." *See Marshall III, supra,* 148 *N.J.* at 269, 690 *A.*2d 1 (quotation omitted). Nor did those allegations outweigh the State's interest in preserving the evidence. *See State ex rel. W.C.,* 85 *N.J.* 218, 224, 426 *A.*2d 50 (1981) ("Whether discovery should be expanded involves exercising judicial discretion or, put another way, balancing the beneficial effects of discovery against its disadvantages."). Thus, the court did not err in refusing to permit defendant access to the original tapes.

Defendant asserts, however, that he needed the original tapes to analyze their magnetic image. Such an analysis, according to defendant, could reveal whether the interrogating officers had stopped and started the tapes, a procedure that could have resulted in adding statements to or deleting them from the tapes.

Defendant's argument concerning the second taped statement is more succinct. He asserts that it is a complete fabrication. He does not indicate, however, how a magnetic-imaging analysis would support his argument. If, as defendant alleges, the tape is a complete fabrication, a magnetic-imagining analysis would not reveal omissions suggestive of tampering. Thus, the most relevant information regarding the second tape would be evidence tending to prove that the voice on that tape is not defendant's.

■ The State produced four witnesses: Captain King, Detective Stefanoni, Vicky Williams, and Carolyn Bennett, who identified defendant's voice on the second tape. Because defendant testified, moreover, the jury could make its own comparison of defendant's voice with that on the tape. If the jury, after such a comparison, believed that defendant had not made the second taped statement, it was free to disregard that statement. *Cf. Brown v. State,* 321 *Ark.* 413, 903 *S.W.*2d 160, 163 (1995) (noting jury's ability to listen to tape and assess credibility of in-court voice identification). Against that background, defendant's discovery request emerges as nothing more than an "unfocused, haphaz-

ard search for evidence." *State v. D.R.H.*, 127 *N.J.* 249, 256, 604 *A.*2d 89 (1992).

Finally, although defendant's taped statements provided compelling evidence of his guilt, they were not the only evidence inculpating him in Eck's murder. Two witnesses, Williams and Bennett, testified that defendant had admitted to stabbing Eck to death. In addition, James Sireci placed defendant at the scene of the murder minutes before its occurrence. DNA tests revealed a 99.9994% probability that the blood found on the latex glove recovered by the police was that of defendant.

That independent evidence of defendant's guilt distinguishes the instant case from *State v. Thomas*, 245 *N.J.Super.* 428, 586 *A.*2d 250 (App.Div.1991), *appeal dismissed*, 130 *N.J.* 588, 617 *A.*2d 1214 (1992), on which defendant relies. In *Thomas*, the Appellate Division reversed the Law Division and granted the defendant's request for access to a rape kit for DNA testing. 245 *N.J.Super.* at 432, 586 *A.*2d 250. Because of advances in DNA testing during the pendency of the appeal, the Appellate Division concluded that the test could definitively establish defendant's guilt or innocence. *Id.* at 436, 586 *A.*2d 250. Underlying *Thomas* was the Court's recognition of the special circumstances of scientific advances in DNA testing. Here, defendant does not suggest any such special circumstances. On the record before us, nothing supports his allegation of tampering. Even if testing revealed evidence of tampering, moreover, the test results would not conclusively prove defendant's innocence. Accordingly, we agree with the trial court's ruling that defendant did not provide a sufficient factual basis to justify access to the original tapes. If, however, defendant can make a sufficient showing, he may renew his request in a petition for post-conviction relief.

B. *Prosecutor's Summation*

█ We turn now to the issue of the propriety of the prosecutor's summation. In conducting our review, we consider the summation within the context of the trial as a whole. *State v. Ramseur*, 106 *N.J.* 123, 323, 524 *A.*2d 188 (1987).

At trial, defendant's strategy was to identify Bryant as the aggressor in both attacks. Defendant's taped statements, however, indicated that he was also an aggressor. Defendant claimed that the State had fabricated and falsified the tapes. On cross-examination of the State's witnesses, defense counsel elicited testimony suggesting how the tapes could have been altered. Additionally, the defense elicited testimony from Captain King to the effect that if King believed someone had tampered with the tapes, he would have submitted them to the FBI for testing. Through this testimony, defendant sought to generate the inference that the tapes could have been altered. Implicitly, defendant contends that the State could have done more to verify the authenticity of the tapes. Defendant, however, never has offered any evidence that justifies submission of the tapes for testing. In the absence of test results, however, defendant tried to raise the specter of tampering.

During summation, defense counsel departed from his representation that he would not delve into the State's refusal to test the tapes. The summation succeeded in casting a pall of tampering over the redacted tapes. Defense counsel stated:

How was the first tape edited, how was the second tape prepared? These are questions you have to contemplate as you deliberate. But as you deliberate, remember there were two tape recorders in that room, both under the sole control of Captain King and Detective Stefanoni. And you know that tapes can be edited and tampered with, and Captain King even indicated to you that if he had an audio tape which he thought was tampered with, he would forward it to the Federal Bureau of Investigation.

And again, Captain King did testify if he had an audio tape which he believed had been edited or tampered with in any way, that he would forward it to the Federal Bureau of Investigation for inspection.

And, finally, remember that the Technical Service Unit of Burlington County Prosecutor's office can redact tapes. In fact, that is what was actually done with [the tapes]. You have been given only bits and pieces of what actually happened, and what was said from the time Robert Morton was arrested at 11:09 a.m. on February 25, to almost 10 p.m. that evening. Whose fault is that?

Robert Morton can only provide you with his testimony, since he was under the complete control of Captain King. But why didn't Captain King choose to provide you with a complete record of what happened, rather choose by design or scheme only to provide part of the information?

By arguing to the jury that the State should have tested the authenticity of the tapes, defense counsel contravened his representation to the court. Contrary to defendant's assertion, the redaction of the tapes, which the court ordered to eliminate information prejudicial to defendant, did not constitute tampering.

■ The trial court acted within its discretion in offering the alternative of either issuing a curative instruction or allowing the prosecutor to address the issue in summation. *See State v. Perry*, 65 *N.J.* 45, 48, 319 *A.*2d 474 (1974) (holding prosecutor's response in summation to "heavy handed statements" made by defense counsel in summation did not constitute prejudicial error); *State v. Jenkins*, 299 *N.J.Super.* 61, 68–69, 690 *A.*2d 643 (App.Div.1997) (holding prosecutor's comments on defendant's post-arrest silence were justified in response to defendant's direct-examination testimony and defense counsel's summation); *State v. Johnson*, 287 *N.J.Super.* 247, 266, 670 *A.*2d 1100 (App.Div.) ("A prosecutor may respond to an issue or argument raised by defense counsel."), *certif. denied*, 144 *N.J.* 587, 677 *A.*2d 759 (1996); *State v. Engel*, 249 *N.J.Super.* 336, 379, 592 *A.*2d 572 (App.Div.) (holding prosecutor's forceful statements in defense of integrity of investigation not error when made in response to defense counsel's summation comments describing State's case as a "big lie," "a disgrace," and "an outrage"), *certif. denied*, 130 *N.J.* 393, 614 *A.*2d 616 (1991).

■ In his summation, the prosecutor responded:

Now, you heard the suggestion raised by Defense Counsel if the prosecution wanted to demonstrate the authenticity of the contents of [the tape] they could have sent it to the FBI or to some other expert, in an attempt to obtain a scientific opinion as to whether the tape is or is not genuine. One thing you may not be aware of as laymen is that's not the exclusive province or ability of the prosecution. Both sides exchange to a limited degree information prior to trial.

. . . .

Both sides exchange information prior to trial. You've seen Defense Counsel cross-examining witnesses with copies of police reports that they've obviously been provided with by the prosecution. That is called discovery.

Both sides also have the subpoena power. Robert Morton is the one who got on the witness stand and testified to you it's not his voice on the statement, and the contents of that statement are not genuine. If the defense wanted you to hear any evidence, any opinion, if there even would be such information, they had every bit

as much opportunity as the prosecution did to present any evidence, conduct any inspections, or do any examinations of the tape they wanted to attempt to demonstrate that to you. It wasn't done; you've heard no such evidence.

You also heard a very logical explanation from Captain King, he was questioned about that on cross-examination, ["]I could have the contents of the tape examined if I thought it wasn't genuine.["] King and Stefanoni believed the tape was a genuine, fluent tape, was genuine, it was the recording that they made in their presence. If the defense wanted to pursue any other line of argument or attack upon that statement, they had the opportunity to do so. That's all I'm going to say about it.

That tape is genuine. It's a taped confession from Robert Morton. And with regard to the second statement, and his description of this crime, and how he committed it, the evidence shows that it's the truth. So, we close the book on that chapter and move on.

The summation suggested that because defendant could have subpoenaed the tapes, he had access to them. In making that suggestion, however, the prosecutor failed to explain that defendant could have obtained the tape only by making an adequate factual showing. To this extent, the statement was both incomplete and inaccurate.

 In response, defendant requested a jury instruction that the court had twice rejected his request for access to the original tapes. The court denied the request. If the court had granted the request, the jury might have concluded that the tapes were genuine. Such an instruction could have redounded to defendant's detriment. *Cf. State v. Bowman,* 165 *N.J.Super.* 531, 537, 398 *A.*2d 908 (App.Div.1979) (holding prosecutor's statement to jury on summation that the trial judge had previously found defendant's confessions to be voluntary constituted reversible error). We conclude that the denial of defendant's requested instruction did not prejudice him.

In addition, we hold that the prosecutor's statement, when considered in the context of the entire trial, did not constitute reversible error. *See State v. Feaster,* 156 *N.J.* 1, 59, 716 *A.*2d 395 (1998) ("[P]rosecutorial misconduct will not serve as the basis for reversal unless it was so egregious as to work a deprivation of a defendant's right to a fair trial."); *State v. Marshall,* 123 *N.J.* 1, 163, 586 *A.*2d 85 (1991) (*Marshall I* ) (holding improper closing

statement by prosecutor not requiring reversal of defendant's conviction and death sentence), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L. Ed.*2d 694 (1993); *Johnson, supra,* 287 *N.J.Super.* at 265, 670 *A.*2d 1100 ("Prosecutorial misconduct must be clear and unmistakable and must substantially prejudice the defendant's fundamental right to have the jury fairly evaluate the merits of his defense.") (citation omitted). When compared with cases in which closing statements have constituted reversible error, the prosecutor's statement in this case was not nearly so egregious. *See, e.g., State v. Rose,* 112 *N.J.* 454, 518–34, 548 *A.*2d 1058 (1988) (finding reversible error in prosecutor's summation in which he argued that the defense expert's testimony was fabricated, extolled the jury to "send a message" by sentencing defendant to death, stated, without evidentiary support, that defendant extorted food from other inmates while in prison, and instructed the jury that it was legally required to impose the death penalty); *Jenkins, supra,* 299 *N.J.Super.* at 69, 690 *A.*2d 643 (holding prosecutor's statements in summation of her personal opinions regarding defendant's credibility to be reversible error); *State v. W.L.,* 292 *N.J.Super.* 100, 110–111, 678 *A.*2d 312 (App.Div.1996) (finding reversible error in prosecutor's statements that were "calculated to arouse sympathy for the victim and hate and anger against the defendant" and that described the jury charge as "boring, confusing, and ridiculous"); *State v. Acker,* 265 *N.J.Super.* 351, 356, 627 *A.*2d 170 (App.Div.) (finding reversible error in prosecutor's statements characterizing defense counsel as "outrageous, remarkable, absolutely preposterous and absolutely outrageous," instructing jury that its function was to protect young victims of alleged sexual offenses as a group, and arguing without basis that defendant was intoxicated at the time of the alleged offense), *certif. denied,* 134 *N.J.* 485, 634 *A.*2d 530 (1993); *State v. Bruce,* 72 *N.J.Super.* 247, 178 *A.*2d 233 (App.Div.1961) (holding prosecutor's summation in which he called defendants "animals" and "brutes" reversible error where such statements were not part of any testimony).

Defendant has not included in the record any evidence of tampering or falsification. Nor has he identified any audible breaks or sounds suggesting that Officers King and Stefanoni selectively started and stopped the tapes. In sum, defendant has not offered any evidence, other than his own testimony, that it was not his voice on the second tape. By contrast, the State has introduced testimony identifying defendant's voice as that on both tapes. It has also introduced significant evidence of defendant's guilt independent of the tapes. In light of those facts, we find that the prosecutor's statements in summation did not constitute reversible error.

### III. *Guilt–Phase Charge*

#### A. *Tailoring the Charge to the Facts*

Defendant argues that the trial court insufficiently tailored the charge to the facts of the case, thereby denying him a fair trial. Specifically, defendant argues that "the court barely discussed the application of the facts to the law, and failed entirely to give any guidance to the jury that took into account the defendant's version of the events." Our examination leads us to conclude, however, that the charge as a whole did not contain reversible error.

Because defendant objects to the charge for the first time on appeal, we review the objection under the plain error standard. *R.* 2:10–2; *see State v. Afanador,* 151 *N.J.* 41, 54, 697 *A.*2d 529 (1997); *State v. Gartland,* 149 *N.J.* 456, 473, 694 *A.*2d 564 (1997). Under that standard, defendant has the burden of proving that the error was clear and obvious and that it affected his substantial rights. *State v. Chew,* 150 *N.J.* 30, 82, 695 *A.*2d 1301 (1997); *see also United States v. Olano,* 507 *U.S.* 725, 734, 113 *S.Ct.* 1770, 1778, 123 *L. Ed.*2d 508 (1993) ("It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.").

During the charge, the trial court used an overhead projector and handouts to delineate the elements of the various offenses. In

addition, the court distributed a verdict sheet that provided further guidance to the jury.

Defendant contends that specific portions of the charge demonstrate the court's failure to tailor the charge to account for his theory of the case. Our review of the charge as a whole, however, leads us to the opposite conclusion. The trial court specifically instructed the jury, consistent with defendant's theory of the case, that mere presence at the scene of the crime was insufficient to find defendant guilty of murder. In addition, during the instructions on accomplice liability and conspiracy, the court informed the jury of the legal significance of a determination that Bryant, rather than defendant, committed the actual murder. At times, the court wove the facts into the charge, and charged the jury that its comments on the facts were not binding on the jury. In sum, the charge neither presented a biased account of the facts nor foreclosed the jury's consideration of defendant's theory of the case. *See Gartland, supra*, 149 *N.J.* at 474, 694 *A.*2d 564; *State v. Bryant*, 288 *N.J.Super.* 27, 37, 671 *A.*2d 1058 (App.Div.), *certif. denied*, 144 *N.J.* 589, 677 *A.*2d 761 (1996).

Additionally, the facts were not so complex or confusing as to require an intricate discussion in the charge. *See State v. Biegenwald*, 106 *N.J.* 13, 44–45, 524 *A.*2d 130 (1987) (*Biegenwald I* ). Defendant's "mere presence" defense did not require the jury to distinguish among several possible mental states of the accused. *Cf. State v. Martin*, 119 *N.J.* 2, 18, 573 *A.*2d 1359 (1990) (noting that, for "nettlesome proposition[s]" like causation, criminal knowledge, or intent, a discussion of the facts should be woven into the charge); *State v. Concepcion*, 111 *N.J.* 373, 380, 545 *A.*2d 119 (1988) (holding, in case involving a determination of several degrees of intent, that a thorough discussion of the facts should have been woven into the charge). When measured by the plain error standard, even cases involving more complex determinations do not necessarily require an intricate explication of the facts. *See Gartland, supra*, 149 *N.J.* at 474, 694 *A.*2d 564 (holding no plain error in failing to weave facts into charge when charge did not

foreclose jury's consideration of facts favorable to defendant and did not confuse or mislead jury in its deliberations). *Compare State v. Delibero,* 149 *N.J.* 90, 106, 692 *A.*2d 981 (1997) (holding no plain error in jury instruction that was not erroneous, but simply "capable of being improved"), *with Afanador, supra,* 151 *N.J.* at 56, 697 *A.*2d 529 (holding incorrect jury instruction to be plain error).

■ In summation, moreover, defense counsel forcefully argued that defendant was merely present, but had not participated in the stabbings. The argument of counsel, although not a substitute for a correct charge, can mitigate the prejudicial effect of an erroneous charge. *See Marshall I, supra,* 123 *N.J.* at 145, 586 *A.*2d 85. In sum, the jury was aware of defendant's theory of the case, and the charge provided the jury with an opportunity to accept or reject that theory.

B. *The Own–Conduct Instruction*

Defendant also challenges the adequacy of the "own-conduct" instruction. He argues that the instruction permitted the jury to decide that defendant by his own conduct had killed Eck, even if the jury could not agree that defendant had delivered one of the fatal stab wounds. According to defendant, the instruction precluded the jury from reaching a non-unanimous own-conduct determination, which would have resulted in a sentence of life imprisonment with a thirty-year parole disqualifier rather than death. *See N.J.S.A.* 2C:11–3b(1). Defendant also argues that the court erred in failing to inform the jury that, if defendant was not found guilty of death-eligible murder, he would be subject to the severe penalty of life imprisonment with a thirty-year parole disqualifier.

■ As a result of this Court's opinion last term in *State v. Cooper,* 151 *N.J.* 326, 700 *A.*2d 306 (1997), the trial court was not required to inform the jury that, absent a death-eligible conviction, defendant would be subject to a term of life imprisonment with a 30–year parole disqualifier. *Id.* at 377–78, 700 *A.*2d 306. Defen-

dant's case, moreover, was tried before our decision in *Cooper*. Consequently, the trial court was not obligated to follow *Cooper*'s prospective direction that in the future courts should inform the guilt-phase jury of the "severe prison sentence[ ]" to which the defendant would be subject if found guilty of non-capital murder. *Id.* at 378–79, 700 *A*.2d 306.

■■■ Nor did the court err by failing to require the jury to find, as a prerequisite to the own-conduct determination, that defendant had inflicted one of the fatal blows. *See State v. Gerald,* 113 *N.J.* 40, 97, 549 *A*.2d 792 (1988) (overruled on other grounds by constitutional amendment). The court's instruction on the own-conduct determination stated in part:

> In this case, the phrase "by his own conduct" means either that, one, Robert Morton struck the knife blow which killed Mr. Eck, or two, that Robert Morton, along with Alonzo Bryant, inflicted stab wounds upon Michael Eck, and that when he did so it was Robert Morton's purpose that Michael Eck should die from the wounds, or he was aware that it was practically certain that Michael Eck would die from the knife wounds.

Under this instruction, the jury, without deciding that defendant had struck the fatal blow, could find that he had killed by his own conduct if it decided that both defendant and Bryant inflicted knife wounds on Eck. As we stated in *Gerald, supra:*

> [T]he focus on the actions of the defendant, as required by the "own conduct" language, does not necessitate a specific finding that the defendant's actions standing alone caused the victim's death. The relevant inquiry is whether or not the defendant *actively and directly participated* in the homicidal act, *i.e.,* in the infliction of the injuries from which the victim died. The critical elements are that defendant in fact acted, and the immediacy of his conduct to the victim's demise.
>
> [113 *N.J.* at 97, 549 *A*.2d 792.]

In determining whether defendant acted by his own conduct, the issue is not whether he or Bryant struck the fatal blows, but whether he participated directly and immediately in the killing. *State v. McDougald,* 120 *N.J.* 523, 561, 577 *A*.2d 419 (1990).

■■■ Here, the victim was stabbed twenty-four times. Three of the wounds alone would have proven fatal. In finding that defendant committed the murder by his own conduct, the jury determined that defendant participated in the attack that caused

Eck's death. Such a finding is legally sufficient to support an own-conduct determination. *See Chew, supra,* 150 *N.J.* at 74, 695 *A.*2d 1301 (noting own-conduct determination involves a judgment "as to whether defendant's participation in the homicidal act was qualitatively sufficient to make the defendant death eligible").

 Defendant further argues that the charge was too vague in defining the requirement that the jury be unanimous in deciding whether he had killed by his own conduct. In a capital trial, the court must inform the jury of its option to render a non-unanimous verdict on the own-conduct determination. *State v. Brown,* 138 *N.J.* 481, 514, 651 *A.*2d 19 (1994), *disapproved of on other grounds by Cooper, supra,* 151 *N.J.* 326, 700 *A.*2d 306. If the jury had reached such a verdict, defendant could not have been sentenced to death. *Brown, supra,* 138 *N.J.* at 514, 651 *A.*2d 19; *see also State v. Loftin,* 146 *N.J.* 295, 350, 680 *A.*2d 677 (1996) ("A jury's inability to decide [own-conduct] unanimously is a *de facto* decision that the defendant is not death-eligible.").

When discussing the unanimity requirements of the own-conduct determination, the trial court gave the following instruction:

Generally, we ask a Jury only if a Defendant has been found guilty of a crime. We do not inquire if the Jury sees a Defendant whom they convict as a principal or an accomplice or a co-conspirator. The practice is different when, as here, one of the charges is potentially punishable by death.

If the jury convicts Mr. Morton or convicts any defendant of a murder in such a case, I must then ask if the Jury unanimously and beyond a reasonable doubt finds two things: one, that the defendant committed a purposeful or knowing murder; and two, that the defendant committed the fatal act by his own conduct.

. . . .

It is permissible for a jury to find a person guilty of a crime if some jurors see the person as the principal and others see him as an accomplice or a co-conspirator. What is essential is that each Juror be satisfied in his or her own mind that all the elements necessary to establish guilt under the theory upon which the Juror convicts has been proven beyond a reasonable doubt. A conviction of murder under these circumstances is perfectly proper.

Under our law, a person is only capital eligible if the Jury finds unanimously and beyond a reasonable doubt both that the Defendant committed a knowing and purposeful murder, and that the Defendant committed the murder by his own conduct.

In that discussion, the court properly instructed the jury that, unlike other crimes, to convict defendant of capital murder, the jury must unanimously determine that defendant had committed purposeful and knowing murder by his own conduct. *See Chew, supra*, 150 *N.J.* at 73, 695 *A.2d* 1301 ("[O]nly a jury verdict that finds unanimously and beyond a reasonable doubt that the defendant committed the murder by his or her own conduct triggers the penalty phase."). The court also correctly noted that "a conviction of murder" was "perfectly proper" even if the jurors disagreed on whether defendant acted as a principal, accomplice, or co-conspirator. *Ibid.* ("A jury need not unanimously agree on the theory of liability as principal or accomplice in order to convict of murder."); *State v. Moore*, 113 *N.J.* 239, 300–01, 550 *A.2d* 117 (1988) ("Failure to satisfy the own conduct requirement does not render a murder conviction invalid"). That instruction provided the jury with the opportunity to convict defendant of murder, albeit non-capital murder, if it could not reach a unanimous decision that defendant had killed by his own conduct. The court then repeated the instruction that, to find defendant guilty of capital murder, the jury must unanimously determine defendant committed a knowing and purposeful murder by his own conduct.

Initially, in explaining to the jury that defendant could be found guilty of murder, despite a non-unanimous own-conduct determination, the court did not specifically inform the jury that such a determination would result in a non-capital sentence. Defendant suggests this omission might have led the jury to convict him of capital murder despite a non-unanimous own-conduct determination in which some jurors believed defendant acted only as an accomplice or co-conspirator.

Defendant's argument, however, ignores the explicit instruction that to convict defendant of capital murder, the jury must unanimously find that he had killed by his own conduct. In addition, the court, at the prosecutor's request, provided the following supplemental instruction: "A person can only be found guilty of capital murder if they're a principal, if they commit the murder by

their own conduct. But all the other charges a person can be held liable as a principal, accessory, or co-conspirator."

The verdict sheet clarified any potential vagueness in the charge. It stated in relevant part:

3. IF YOU HAVE BOTH FOUND DEFENDANT GUILTY OF MURDER AND CHECKED "2A" [purposeful-or-knowing murder] ABOVE, THEN CHECK "3A," OR "3B," BELOW:

A. Robert W. Morton committed the murder by his own conduct, i.e., Robert W. Morton, either alone or along with Alonzo Bryant, participated in stabbing Michael Eck, with the purpose to kill him or with the knowledge that the stabbing was practically certain to kill him. . . . . ./____/

B. Unable to Agree Unanimously on "3A", i.e., unable to agree unanimously that Robert W. Morton, either alone or along with Alonzo Bryant participated in stabbing Michael Eck with the purpose to kill him or with the knowledge that the stabbing was practically certain to kill him. . . . . ./____/

These options unequivocally conveyed to the jury the requirement that it must be unanimous in finding that defendant had killed by his own conduct. By checking "3A," the jury so found. In sum, the court cured any ambiguity in the initial charge through its subsequent instruction and the verdict sheet. *See Feaster, supra,* 156 *N.J.* at 45–46, 716 *A.*2d 395 (holding that the verdict sheet may clarify ambiguities in the jury charge); *McDougald, supra,* 120 *N.J.* at 561–62, 577 *A.*2d 419 (noting, in upholding adequacy of the charge, the verdict sheet's correct delineation of the jury's own-conduct determination options); *cf. State v. Mejia,* 141 *N.J.* 475, 487, 662 *A.*2d 308 (1995) (noting, in finding that the charge constituted reversible error, the fact that the verdict sheet mirrored the erroneous charge).

## C. *Other Allegations of Error in the Charge*

Defendant argues that the court failed to provide the jury with the option of convicting defendant on a unified theory of murder. Such an option, defendant claims, would have permitted the jurors to disagree on a single theory of culpability, thereby resulting in a non-death-eligible conviction. Defendant also contends that the court's sequential instruction on purposeful-or-knowing murder and felony murder was reversible error. Consistent with *Cooper, supra,* 151 *N.J.* at 356–70, 700 *A.*2d 306, we

reject both of these claims. Due to the difference in the requirements of the mental state for purposeful-or-knowing murder as distinguished from felony murder, *Cooper* concluded that the Legislature did not intend to create a unified crime of murder, *id.* at 360, 700 *A.*2d 306, and that a unified murder option would cause extraordinary confusion in the charge. *Id.* at 363, 700 *A.*2d 306. Thus, the trial court did not err in failing to charge the jury on the unified murder theory. For the same reason, the court did not err in its sequential charge. *Id.* at 369–70, 700 *A.*2d 306.

Defendant also argues that the trial court erred in failing to instruct the jury that it had to find defendant's confessions credible beyond a reasonable doubt and by noting the State's claim that defendant had been advised of his *Miranda* rights on several occasions. Defendant's arguments are without merit.

 Under *State v. Hampton*, 61 *N.J.* 250, 294 *A.*2d 23 (1972), the court is required to instruct the jury to disregard defendant's statements if they find, after considering the evidence, the statements to be untrue. *Id.* at 272, 294 *A.*2d 23; *see also N.J.R.E.* 104(c) (codifying the *Hampton* rule). The court, however, was under no duty to instruct the jury that it must find defendant's statements credible beyond a reasonable doubt. *Chew, supra,* 150 *N.J.* at 82–83, 695 *A.*2d 1301.

 *State v. Kociolek,* 23 *N.J.* 400, 129 *A.*2d 417 (1957), directs that the court must instruct the jury of the inherent weakness of oral statements. *Id.* at 421, 129 *A.*2d 417. In so doing, the court is permitted to comment on the evidence. *State v. Laws,* 50 *N.J.* 159, 177, 233 *A.*2d 633 (1967). Here, in addition to discussing the purported *Miranda* warnings, the court noted defendant's allegation that the tapes of his confessions were doctored. The court's comments on the evidence were balanced and served to enhance, rather than detract from, the adequacy of the charge.

## IV. *Mitigation Evidence*

Defendant refused to attend the penalty phase proceedings. In lieu of testimony, defense counsel submitted a 200–page mitigation book and a list of the sixty mitigating factors it would attempt to establish. The mitigation book contained a prediction that defendant would die in prison if he was not sentenced to death; a timeline of defendant's troubled childhood; Bryant's criminal record, prison record, and federal presentence report; Harper's statement to the police; defendant's medical records, including psychiatric records; defendant's school records, including Child Study Team reports, psychiatric evaluations, and documentation of his misbehavior; and excerpts from the *Diagnostic & Statistical Manual of Mental Disorders* (4th ed.) and the *Miller–Keane Encyclopedia & Dictionary of Medicine, Nursing, & Allied Health.* After providing each juror with a copy of the mitigation book, the court instructed the jury to read the book in its entirety. The court, however, refused to specify the sixty separate mitigating factors in its charge. It nonetheless provided the jury with a list of the factors together with the book. The court also enumerated these factors on the verdict sheet as evidence supporting the "catch-all" mitigating factor. *See N.J.S.A.* 2C:11–3c(5)(h). Thereafter, the jury spent three hours reading the book.

Over his attorneys' objections, defendant declined to cooperate in the preparation of mitigating evidence. For example, he steadfastly refused to consult with a psychologist or a psychiatrist. Explaining that "there are some things a man must keep private," he refused to discuss any potential mitigating information with his counsel. Furthermore, he forbade his attorneys from presenting any mitigating evidence that suggested his limited intelligence. Defendant denied that he suffered from any psychological problems, such as borderline intellectual functioning, and reacted violently to suggestions of his psychological or intellectual imperfections or of his mother's flaws.

The strength of defendant's reaction posed a continuing problem to his counsel. According to defendant's trial counsel, defendant's

original counsel withdrew from representing defendant because they feared for their safety.

At the penalty-phase trial, the defense presented no witnesses. Instead, the defense relied on the mitigation book. No expert testified about the contents of the mitigation book, and no family member testified in support of the facts included in the book.

Defense counsel discussed the mitigation book in his opening statement and summation. In his opening, counsel detailed the facts of defendant's childhood, including his mother's deficiencies in parenting and his slow mental development. Counsel noted that defendant's mother would not allow him to be placed in special education classes. Before explicitly asking the jury to spare defendant's life, counsel argued: "You will see his mother's overwhelming [penchant] for being involved stole any sense of responsibility he had, and fed into his delusional attitudes concerning his abilities."

In summation, counsel recounted defendant's troubled childhood, borderline intelligence, and problems in school. The summation mentioned that, as a child, defendant suffered from a stress ulcer, which reflected his tension-filled childhood. Defendant's mother refused to acknowledge defendant's behavioral and learning deficiencies and to allow defendant to receive special education and counseling. Counsel alleged that Bryant, not defendant, instigated the Eck stabbing and that Bryant took advantage of defendant's mental deficiencies to goad him into committing robberies.

▮▮▮▮ Before us, defendant argues that he was denied effective assistance of counsel. *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L. Ed.*2d 674 (1984); *State v. Fritz,* 105 *N.J.* 42, 519 *A.*2d 336 (1987). Defendant states that his trial counsel failed to call any witnesses in support of his mitigation evidence, noting specifically that counsel failed to elicit testimony from defendant's mother, daughter, or the social worker who was hired to review his case. Defendant has the right to effective assistance

of counsel. Despite defendant's refusal to cooperate, trial counsel remained obligated to present mitigating evidence. *State v. Koedatich,* 112 *N.J.* 225, 336, 548 *A.*2d 939 (1988) (*Koedatich I* ). Thus, in evaluating defendant's claim, we must determine " 'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *State v. Buonadonna,* 122 *N.J.* 22, 41, 583 *A.*2d 747 (1991) (quoting *Strickland, supra,* 466 *U.S.* at 686, 104 *S.Ct.* at 2064, 80 *L. Ed.*2d at 692–93).

To prove ineffective assistance of counsel in his penalty-phase trial, defendant must pass a two-pronged test. First, defendant must demonstrate that "counsel's performance was truly deficient, with such grievous errors that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Buonadonna, supra,* 122 *N.J.* at 41, 583 *A.*2d 747 (citations omitted). Second, defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially." *Marshall III, supra,* 148 *N.J.* at 250, 690 *A.*2d 1.

The record does not reveal why counsel did not call defendant's mother, daughter, or social worker as witnesses. Although the failure to call such witnesses could demonstrate ineffective assistance, it also could represent a strategic decision by trial counsel. *See State v. Davis,* 116 *N.J.* 341, 357, 561 *A.*2d 1082 (1989) ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.") (citation omitted). The fact that defendant's trial counsel employed a social worker as a mitigation expert suggests at least that defense counsel explored the possibility of eliciting expert testimony on defendant's behalf. *Cf. State v. Savage,* 120 *N.J.* 594, 623–25, 577 *A.*2d 455 (1990) (reversing defendant's conviction because counsel's failure to investigate mitigation evidence amounted to ineffective assistance). Perhaps counsel did not call the social worker as a witness because her testimony would not have been favorable. Similarly, testimony from defendant's moth-

er might have undermined defense counsel's attempts to portray her parenting as inadequate and defendant's childhood as troubled. In addition, if defendant and his daughter did not have a good relationship, defense counsel might have been correct in deciding not to call her to testify. Thus, we disagree with defendant's assertion that no possible justification exists for defendant's trial counsel's failure to call these witnesses. Moreover, due to the forceful opening and closing statements and the submission of a mitigation book at the penalty phase, the record does not demonstrate that the counsel's performance was ineffective. In this context, the dissent to the contrary notwithstanding, *post* at 479, 715 *A*.2d at 277, the failure to call witnesses does not necessarily constitute grounds for reversal. *See Marshall III*, *supra*, 148 *N.J.* at 253–54, 690 *A.2d* 1 (rejecting defendant's ineffective assistance claim despite counsel's failure to present penalty-phase witnesses, hire mitigation expert, or present mitigating evidence, when post-conviction relief record contained no evidence of mitigating factors).

One demonstration of the effectiveness of counsel is that the jury found the following mitigating factors:

It is likely that Robert Morton will die in prison prior to first becoming eligible for parole.

1 yes, 11 no.

Robert Morton has no prior criminal record.

7 yes, 5 no.

Robert Morton would not have committed the offenses for which he has been convicted were it not for Alonzo Bryant.

10 yes, 2 no.

Robert Morton would not have participated in these offenses were it not for Alonzo Bryant.

10 yes, 2 no.

The jury also wrote in the following mitigating factor:

Robert Morton is the only child.

3 yes, 9 no.

Contrary to the dissent, *post* at 480, 715 *A*.2d at 277, the record does not establish that trial counsel was ineffective. *See State v. Dixon*, 125 *N.J.* 223, 261–62, 593 *A.2d* 266 (1991) (refusing to

decide ineffective assistance claim on direct appeal where record was "inadequate to disclose what reasons of tactic and strategy motivated counsel"); *see also State v. Preciose*, 129 *N.J.* 451, 460, 609 *A.*2d 1280 (1992) ("Our courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record."). Our decision, however, does not bar defendant from revisiting his ineffective-assistance-of-counsel claim in a petition for post-conviction relief. See *Marshall III, supra*, 148 *N.J.* at 147–54, 690 *A.*2d 1 (permitting defendant to raise ineffective assistance claims on post-conviction relief proceeding despite rejection of these claims at direct appeal); *Preciose, supra*, 129 *N.J.* at 460, 609 *A.*2d 1280 ("Ineffective-assistance-of-counsel claims are particularly suited for post-conviction review because they often cannot be raised reasonably in a prior proceeding.").

 Defendant also argues that the trial court erred in refusing to read each of the sixty proposed mitigating factors during the penalty-phase charge. We hold, however, that the trial court did not err in listing the sixty proposed factors under the "catch-all" mitigating factor. *See State v. Harris*, 156 *N.J.* 122, 185, 716 *A.*2d 458 (1998) (finding no error in court's consolidation of 180 submitted mitigating factors into a single catch-all factor addressing defendant's childhood). The court instructed the jury that the weighing of aggravating and mitigating factors is a qualitative process. In addition, each of the sixty proposed factors was included on the verdict sheet. *See State v. Biegenwald*, 126 *N.J.* 1, 47, 594 *A.*2d 172 (1991) (*Biegenwald IV*) (requiring relevant mitigating factors established by reasonable evidence to be listed on verdict sheet). The court's response more than sufficed to meet its responsibility concerning the presentation of mitigating evidence. *Harris, supra*, 156 *N.J.* at 187 n. 4, 716 *A.*2d 458 (suggesting that the defense counsel work with the court to reduce excessive number of alleged mitigating factors by grouping such

factors into smaller number of discrete categories, which would be submitted to jury).

In addition to instructing the jurors to read their individual copies of the mitigation book in its entirety, the court questioned the jury to confirm that each juror had sufficient time to read the book. Thus, the jury answered the questions on the verdict sheet with knowledge of the evidence on which defendant relied to support the sixty items comprising the catch-all mitigating factor. *See State v. Bey,* 112 *N.J.* 123, 161, 548 *A.*2d 887 (1988) (*Bey II*) (requiring each juror individually to determine existence of mitigating factors).

## V. *Defendant's Absence*

Before us, defendant argues that his absence from the penalty phase of the trial constituted reversible error. He argues that he could not waive his right to be present at the penalty phase. Alternatively, he challenges the adequacy of his waiver. He also asserts that his trial counsel, who made an *ex parte* request to the court to bar him from the penalty phase, suffered from a conflict of interest because they feared their own safety would be jeopardized if he was present at the penalty phase.

### A. *Waiver of Right to be Present*

We reject defendant's argument that he may not waive his right to be present at the penalty phase of his trial. A criminal defendant's right to be present at trial is grounded in the constitutional right to confront witnesses. *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10; *see State v. Ellis,* 299 *N.J.Super.* 440, 447, 691 *A.*2d 403 (App.Div.), *certif. denied,* 151 *N.J.* 74, 697 *A.*2d 546 (1997). The constitutional nature of this right, however, does not preclude its waiver. A criminal defendant can waive constitutional rights, including the right to counsel, *see Faretta v. California,* 422 *U.S.* 806, 807, 95 *S.Ct.* 2525, 2527, 45 *L. Ed.*2d 562 (1975); *State v. Crisafi,* 128 *N.J.* 499, 509, 608 *A.*2d 317 (1992); *State v. McCombs,* 81 *N.J.* 373, 378, 408 *A.*2d 425 (1979), the right to a trial by jury, *see McCarthy v. United States,* 394 *U.S.* 459, 466, 89 *S.Ct.*

1166, 1171, 22 *L. Ed.*2d 418, 425 (1969); *State v. DiFrisco,* 137 *N.J.* 434, 452–56, 645 *A.*2d 734 (1994) (*DiFrisco II* ), *cert. denied,* 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L. Ed.*2d 873 (1996); *State v. Barboza,* 115 *N.J.* 415, 420, 558 *A.*2d 1303 (1989), and the right to remain silent, *see Chew, supra,* 150 *N.J.* at 61, 695 *A.*2d 1301; *State v. Fuller,* 118 *N.J.* 75, 85, 570 *A.*2d 429 (1990).

In a non-capital case, a defendant's right to waive his or her presence at trial is clear. *See State v. Finklea,* 147 *N.J.* 211, 222, 686 *A.*2d 322 (1996), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 110, 139 *L. Ed.*2d 63 (1997); *see also Taylor v. United States,* 414 *U.S.* 17, 19–20, 94 *S.Ct.* 194, 195–96, 38 *L. Ed.*2d 174, 177 (1973) (holding defendant's voluntary absence after attending opening of his trial constituted valid waiver). Even in a capital case, a defendant's right to be present is not absolute. *See Illinois v. Allen,* 397 *U.S.* 337, 343, 90 *S.Ct.* 1057, 1060, 25 *L. Ed.*2d 353 (1970). A defendant may be removed from the courtroom without his consent if he behaves "in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Ibid.,* 90 *S.Ct.* at 1060–61; *see also Snyder v. Massachusetts,* 291 *U.S.* 97, 106, 54 *S.Ct.* 330, 332, 78 *L. Ed.* 674 (1934) (noting that a defendant may waive the right to be present at trial by consent or misconduct). Although we have not decided previously whether a defendant may voluntarily absent himself from a capital trial, *see Mejia, supra,* 141 *N.J.* at 505, 662 *A.*2d 308, other jurisdictions have permitted such a waiver. *See Campbell v. Wood,* 18 *F.*3d 662, 672 (9th Cir.) (holding that a capital defendant can waive his right to be present at jury selection), *cert. denied,* 511 *U.S.* 1119, 114 *S.Ct.* 2125, 128 *L. Ed.*2d 682 (1994); *People v. Robertson,* 48 *Cal.*3d 18, 255 *Cal.Rptr.* 631, 767 *P.*2d 1109, 1134 (holding that a capital defendant can waive his right to be present at a penalty-reduction hearing), *cert. denied,* 493 *U.S.* 879, 110 *S.Ct.* 216, 107 *L. Ed.*2d 169 (1989); *Peede v. State,* 474 *So.*2d 808, 814 (Fla.1985) (holding that a capital defendant can waive his right to be present at the guilt phase), *cert. denied,* 477 *U.S.* 909, 106 *S.Ct.* 3286, 91 *L. Ed.*2d 575 (1986). We

have, however, recognized a defendant's right to waive other fundamental rights in a capital case. *See, e.g., Chew, supra,* 150 *N.J.* at 61, 695 *A.*2d 1301 (permitting waiver of *Miranda* rights); *Mejia, supra,* 141 *N.J.* at 501, 662 *A.*2d 308 (same); *DiFrisco II, supra,* 137 *N.J.* at 455–56, 645 *A.*2d 734 (permitting entry of guilty plea and waiver of jury trial at penalty phase); *Barboza, supra,* 115 *N.J.* at 420, 558 *A.*2d 1303 (permitting entry of guilty plea). Consistent with those authorities, we conclude that defendant is not precluded from waiving his right to be present in a capital case.

Moreover, the benefits typically associated with a defendant's presence at trial did not obtain in this case. Typically, presence at trial affords a defendant an opportunity to communicate with counsel, to assist in the preparation of the defense, and to help with cross-examination. *State v. Hudson,* 119 *N.J.* 165, 172, 574 *A.*2d 434 (1990); *State v. Butler,* 278 *N.J.Super.* 93, 99–100, 650 *A.*2d 397 (App.Div.1994). Defendant, however, adamantly refused to assist his counsel in the preparation of mitigating evidence.

The State called only two witnesses, an emergency medical technician and a registered nurse, both of whom had treated Eck on the night of his murder and testified that Eck suffered physical pain before his death. Before us, defendant does not specify how he could have helped counsel in the cross-examination of those witnesses. The dissent urges the inadequacy of defendant's waiver of his right to be present because "the court never explicitly told defendant that his presence would permit him to assist counsel ... with the cross-examination of State witnesses." *Post* at 472, 715 *A.*2d at 273. Like defendant, the dissent fails to specify how defendant could have assisted counsel in the cross-examination of those witnesses, whose testimony focused exclusively on Eck's pain and suffering.

As the trial court found, defendant threatened to react in a disorderly and violent fashion to the presentation of mitigating evidence. Notwithstanding that finding, both defendant and the dissent, *post* at 472–73, 715 *A.*2d at 273–74, argue that defendant's

absence deprived him of exerting a humanizing effect on the jury. The facts, however, illustrate that defendant's presence, instead of yielding that effect, would have undermined the mitigating evidence. Furthermore, because defendant chose to testify during the guilt phase, the jury saw and heard him. His absence at the penalty phase did not prevent the jury from perceiving defendant as a person. *Cf. DiFrisco II, supra,* 137 *N.J.* at 478, 645 *A.*2d 734 (noting, in discussion of allocution, "that a defendant should not be sentenced to death by a jury which never heard the sound of his voice") (internal quotation omitted). In sum, no policy precluded defendant from waiving his right to be present at the trial. *Snyder, supra,* 291 *U.S.* at 106–07, 54 *S.Ct.* at 332, 78 L.Ed. 674 (1934); *see Kentucky v. Stincer,* 482 *U.S.* 730, 745–47, 107 *S.Ct.* 2658, 2667–68, 96 *L. Ed.*2d 631 (1987); *United States v. Gagnon,* 470 *U.S.* 522, 527, 105 *S.Ct.* 1482, 1484–85, 84 *L. Ed.*2d 486 (1985).

### B. *The Adequacy of Defendant's Waiver*

On several occasions throughout the trial, defendant elected not to attend the proceedings. Defendant was not in court during the *voir dire* of individual jurors, the jury deliberations at the guilt-phase trial, the penalty-phase trial, and the rendering of the penalty-phase verdict. Before his absence at each of these stages, except the penalty-phase verdict, defendant appeared before the court with counsel for the purpose of waiving his right to be present. Each time, the court questioned defendant regarding his waiver. Concerning the rendering of the penalty-phase verdict, defendant simply refused to return to court, despite the court's instruction that his presence at the verdict was required. The court, however, elected not to use physical force to assure defendant's presence. Jury selection for defendant's trial began on March 19, 1996. On April 10, with defendant present, defense counsel informed the court that defendant wished to waive his presence during the individual juror *voir dire* process. Counsel stated:

I have explained to Mr. Morton that he has a Constitutional right to be here during all phases of the proceeding, as was evidenced yesterday when Mr. Morton was ill. We had to adjourn the proceedings since as of yesterday he did not wish to waive his appearance.

I would indicate to the Court that in my discussion with Mr. Morton, I have inquired whether or not his desire to be present during the individual voir dire process is as a result of an ongoing illness and he has indicated that is not the case.

The reason why Mr. Morton does not wish to be here is really not of the Court's concern, but the Court does at this point have to inquire of Mr. Morton as to whether or not he is voluntarily waiving his appearance during this part of the proceedings.

. . . .

The only other matter, Your Honor, is that Mr. Morton in waving his appearance today—obviously this is not a waiver that he cannot revoke in the future should he desire to participate in the individual—be present during the individual voir dire process. And I would ask that the Court in some way arrange so that Mr. Morton has the ability to communicate with counsel in the event he decides on a morning or during an afternoon session that he desires to be here

. . . .

## The court then engaged in a colloquy with defendant to ascertain whether his waiver was knowing and voluntary.

THE COURT: Mr. Morton, can you please stand up? For almost everything it's proper for the Judge not to direct his comments directly to the defendant. This is one of those rare cases where I have to do that, okay? You understand that?

THE DEFENDANT: I understand.

THE COURT: You heard what [defense counsel] said?

THE DEFENDANT: Yes, I did.

THE COURT: You understand that?

THE DEFENDANT: Yes.

THE COURT: And you agree with what he said?

THE DEFENDANT: Yes.

THE COURT: Now, I have to be a little more specific. When a defendant asks to be absent during a criminal jury trial I'm usually concerned about that. Because sometimes it can work out to a defendant's disadvantage. They can, you know, see the testimony, hear the witnesses and get a sense of the situation.

It seems to me that this individual interview of jurors is different and that your absence here is far less critical than it might be at another point in the trial. I can't in any way advise you why you should or shouldn't be present. I just want to say to you that I am perfectly comfortable with it if you choose not to be here.

. . . I want you to feel perfectly free to change your mind at any time. You let us know if you want to be over here. We will get you right away. . . . If you just give us the word, we will be most happy to have you here. . . . And I will call the

Warden and ask them if they can make sure that if you do want to come over, you can get the word to Mr. Call's office right away.

You also, if you prefer, can remain here in the detention area. But my impression would be that you prefer to be back in the County Jail; is that correct?

THE DEFENDANT: For right now, yeah.

In this exchange, the court explained that, by waiving his right to be present, defendant was depriving himself of the opportunity to witness and assist in the trial. By informing defendant that his absence at the juror *voir dire* would be "far less critical" than at other stages of the trial, the court indicated the comparative importance of defendant's attendance at other phases of the trial. The court also informed defendant that he possessed an absolute right to change his mind and return to court.

Although he chose to remain absent from most of the *voir dire*, defendant was present during the guilt-phase trial, until the jury began its deliberations. On June 25, 1996, after the jury began deliberations, defendant, through defense counsel, requested to waive his right to be present. The court engaged both defense counsel and defendant regarding this request. The discussion began when defense counsel presented defendant's request to the court. Counsel stated:

It is Mr. Morton's desire that he be, or he be allowed to absent himself from the remaining proceedings up until the verdict. He does wish to be here for the verdict, but as to any other procedural matters, and any other questions which might be addressed by the Jury to the Court, he has indicated he has no desire to be here during those particular proceedings. He understands he has an absolute right to be here. We have done this before with Mr. Morton. He understands what his rights are, and understanding those rights he has asked me to request that the Court allow him to absent himself for all proceedings prior to the verdict.

The court then addressed defendant regarding his request.

THE COURT: Okay Mr. Morton, you want to stand up. Mr. Morton, we talked about this before, but I just need to put it on the record. You understand you have a perfect right to be here in the courtroom, you're welcome to be here. If you choose to, because you'd be more comfortable in the county jail, and not subject to the stress of being here in the courtroom, it's perfectly all right, and you've heard what your lawyer had to say. Do you wish to be excused from the courtroom until the Jury has a verdict?

THE DEFENDANT: Yes I do.

THE COURT: Okay. Now I understand that you have access to a telephone, and you can call Mr. Call's office or ask the jail people as well to contact my chambers.

Any time you want to come over, we'll arrange for you to come over right away, okay?

Once again, the court engaged in an on-the-record exchange with defendant in which defendant confirmed his wish to absent himself from the court proceedings.

The next day, June 26, 1996, the jury found defendant guilty of the purposeful and knowing murder of Michael Eck by his own conduct. Before the commencement of the penalty phase, defendant, through counsel and in direct exchanges with the court, waived both his right of allocution and his right to be present during the penalty phase. After the court discussed with defendant the waiver of his right of allocution, defense counsel raised defendant's request to waive his right to be present.

> [COUNSEL]: Your Honor, also, again, as Mr. Morton has chosen not to exercise his right of allocution and speak with the Jurors, Mr. Morton has also requested that I, once again, indicate to the Court that he does not desire to be present during the penalty phase of the case. We have, Mr. Morton has exited the courtroom on several occasions, he has also been apprised by the Court of his various rights, and also, of his discretion not to be present during any particular aspect of the proceeding. I have gone over those rights once again with Mr. Morton, and he has asked that I, once again, request that he be excused from the remainder of the penalty phase of the case, although understanding that in the event there is a verdict in the case, or in essence, a sentence decided upon by the Jury, he will be required then to appear.
>
> THE COURT: Okay, and you've heard what [defense counsel] has said, correct, Mr. Morton?
>
> THE DEFENDANT: That is correct.
>
> THE COURT: And you wish to be not in the courtroom during the proceedings on the penalty?
>
> THE DEFENDANT: That is correct.
>
> THE COURT: Okay, sir. All right. That is understandable, I know you've talked it over with your lawyer, the advantages and disadvantages of that, and I take it to be your decision, which represents a knowing and intelligent waiver of your right to be present, and I will honor your request.
>
> THE DEFENDANT: Thank you.
>
> THE COURT: Now, we'll just let the jail know, as today, that we need you on pretty quick notice when we do finally need you, and we wish you good luck. Thank you, sir.

 To be sufficient, the waiver of a fundamental constitutional right must be given intelligently and voluntarily. *See*

*Miranda v. Arizona,* 384 *U.S.* 436, 444, 86 *S.Ct.* 1602, 1612, 16 *L. Ed.*2d 694, 707 (1966); *Johnson v. Zerbst,* 304 *U.S.* 458, 464, 58 *S.Ct.* 1019, 1023, 82 *L. Ed.* 1461, 1466 (1938); *Cooper, supra,* 151 *N.J.* at 354–55, 700 *A.2d* 306; *Chew, supra,* 150 *N.J.* at 61, 695 *A.2d* 1301; *Buonadonna, supra,* 122 *N.J.* at 35, 583 *A.2d* 747; *State v. Hartley,* 103 *N.J.* 252, 260, 511 *A.2d* 80 (1986); *State v. Jackson,* 272 *N.J.Super.* 543, 550, 640 *A.2d* 863 (App.Div.1994), *certif. denied,* 142 *N.J.* 450, 663 *A.2d* 1358 (1995). Implicit in that requirement is the judicial obligation to assure that defendants understand the implications of a waiver of the right to be present. To meet that requirement, trial courts should question defendants about their understanding of the nature and consequences of their absence from the trial.

■ Here, the facts demonstrate that defendant knowingly and voluntarily waived his right to be present at his trial. On three separate occasions, the court engaged defendant and defense counsel regarding defendant's waiver. *See Johnson, supra,* 304 *U.S.* at 464, 58 *S.Ct.* at 1023 (noting validity of waiver is to be based on the specific facts of each case). Unlike the dissent, post at 466–68, 715 *A.2d* at 270–71, we believe that the better approach when determining the adequacy of a defendant's waiver is to examine the totality of the facts. *Cooper, supra,* 151 *N.J.* at 355, 700 *A.2d* 306 ("To determine voluntariness, courts examine the totality of the circumstances."); *see also R.* 3:16(b) (noting waiver of defendant's right to be present "may be found ... from the defendant's express written or oral waiver placed on the record"). The court informed defendant of the importance of his absence, determined that defendant's waiver was knowing and voluntary, and explained to him that he could change his mind at any time. Confirming the voluntariness of defendant's waiver is his steadfast refusal to assist counsel in preparing mitigating evidence and his violent reaction to mitigation evidence regarding his intelligence and childhood. In sum, defendant wished to take no part in the penalty phase. Defendant's desire to be absent from the proceed-

ings further manifested itself in his refusal to obey the court's order to return for the rendering of the penalty-phase verdict.

## C. Counsel's Alleged Conflict of Interest

During the last week of the guilt-phase trial, defense counsel at an *in camera* hearing made an *ex parte* motion requesting that the court bar defendant from attending the penalty-phase trial. At the hearing, counsel explained that defendant refused to cooperate in the preparation of any type of mitigating evidence. Specifically, defendant refused to undergo a psychiatric evaluation and forcefully objected to counsel's plans to assert, in mitigation, defendant's low intelligence or his childhood problems. As summarized by counsel:

> It is a twofold objection that [defendant] has to any type of mitigation. Mitigation which would suggest that he is in any way not a perfect individual, and second of all—and perhaps even more likely to elicit a violent response from Mr. Morton—and by violent, I'm talking about a physical response from Mr. Morton—would be the suggestion that his mother is anything other than saintly.

In response, the court referred to specific statements in defendant's confessions suggesting "that Mr. Morton tends to expressly threaten to kill individuals when he is frustrated." In fact, defendant had reacted so violently to his original trial counsel when they informed him of the evidence the State planned to use against him that they were forced to withdraw from the case.

The dissent contends that counsels' *ex parte* motion to bar defendant from the penalty phase put "the court ... on notice that counsel may have strongly pressured defendant to forsake his right of presence." *Post* at 470, 715 *A.2d* at 272. Nothing in the record, however, suggests the exercise of any pressure on defendant. The dissent also suggests that counsels' motion was based on fear for their own safety. *Ibid.* The record tells otherwise. Despite their concerns about defendant's violent tendencies, defense counsel explained:

> [O]ur personal safety is not a factor that the—that we are asking the Court to consider at this particular point, to be quite candid with the Court. We are concerned much more about the effect it would have upon the jury if, during

[defense co-counsel's] opening, Mr. Morton was choking me to death at counsel table.

In this statement, counsel acknowledged that their request to exclude defendant was based primarily, if not exclusively, on the strategic decision that defendant's violent temper would undermine the mitigating evidence.

Moreover, trial counsels' request to exclude defendant from the penalty phase was made after consultation with the Appellate Section of the Public Defender's office. When making their motion before the court, defendant's trial counsel stated:

I had a conference with other members of the Public Defender's staff at their Appellate Section, in trying to contemplate what should be done, what would be in the best interest of Mr. Morton. Recognizing that Mr. Morton, that there is a constitutional right to be present, we have to weigh against that the fact that Mr. Morton's presence will in some way, perhaps, inhibit the presentation of mitigating evidence.

But perhaps of greatest concern is that we feel that the presentation of mitigating evidence will result in a violent outbreak by Mr. Morton in the courtroom, which I think, as the Court has already noted, would be the most devastating thing that could happen to him from the jury perspective in that they would conclude that Mr. Morton cannot even behave himself in a controlled environment, which would raise issues for the jurors as to whether or not the death penalty was or was not appropriate.

From the foregoing, we conclude that trial counsels' motion to exclude defendant from the penalty phase resulted not from a conflict of interest arising from counsels' fear for their own safety, but from their trial strategy that defendant's presence would undermine the mitigating evidence. Even in capital cases, strategic decisions by defense counsel do not constitute grounds for reversal except in the most extreme cases. *Loftin, supra,* 146 *N.J.* at 336, 680 *A.*2d 677; *Marshall I, supra,* 123 *N.J.* at 93, 586 *A.*2d 85. In sum, defendant should not be allowed to convert unsuccessful trial strategy into grounds for reversal of a criminal conviction. *See State v. Macon,* 57 *N.J.* 325, 333, 273 *A.*2d 1 (1971) (refusing to "reward the litigant who suffers an error for tactical advantage either in the trial or on appeal" with a reversal of an adverse decision).

Although the dissent argues that a conflict of interest necessarily arises whenever counsel requests that a defendant be absent from a penalty phase, *post* at 483, 715 *A*.2d at 279, the facts of this case belie the argument. Trial counsel's decision to request defendant's absence, made after consultation with the Public Defender's Appellate Section, was consistent with an effective presentation of mitigating evidence. *See State v. Martini*, 144 *N.J.* 603, 609, 677 *A*.2d 1106 (1996) (stating defendant may not waive presentation of mitigating evidence), *cert. denied*, — *U.S.* —, 117 *S.Ct.* 699, 136 *L. Ed.*2d 621 (1997). Although defendant objected to the presentation of mitigating evidence, policy reasons generally support the presentation of such evidence in a capital case. *Koedatich I, supra,* 112 *N.J.* at 329–30, 548 *A*.2d 939. Counsel's decision to present mitigating evidence on defendant's behalf, although against defendant's wishes, did not create a conflict requiring the appointment of standby counsel. Contrary to the dissent, *post* at 483–84, 715 *A*.2d at 279, the record does not justify the appointment of standby counsel in this case. That conclusion, however, does not prevent defendant from attempting to present a more complete record in his application for post-conviction relief.

D. *Defendant's Pretrial Absence*

Defendant argues that his absence from a pretrial hearing, in which the court addressed six of his motions, constitutes reversible error. On December 1, 1994, the court held a hearing on six motions, the purpose of which was to close pretrial proceedings to the press; to declare the death penalty in violation of international law; to dismiss the capital counts of the indictment due to the alleged inadequacy of facts and instructions presented to the grand jury; to exclude the victims' relatives from the courtroom; to exclude Chrostowski from the courtroom; and to sever the counts pertaining to the incident with Chrostowski.

Due to an administrative error, the authorities did not transport defendant from the Monmouth County Jail to the courthouse.

Defendant was temporarily incarcerated in the Monmouth County Jail rather than the Burlington County Jail. His name was omitted from a computer printout of defendants scheduled to appear in court. Defense counsel objected to holding the hearing in defendant's absence and requested an adjournment. At the hearing, eight attorneys, including two representing Bryant, two representing defendant, two representing the State, and two representing several newspapers were present. The court denied the motion for adjournment because of difficulty in rescheduling a hearing and because the motions dealt with questions of law. Defendant appeals from only one of the rulings, the decision not to sever the counts relating to the Chrostowski stabbing.

Generally speaking, criminal defendants, particularly those charged with a capital offense, should be present during court proceedings. Indeed, after the hearing on the subject motion, this Court amended *Rule* 3:16 to provide: "The defendant must be present for every scheduled event unless excused by the court for good cause shown." *R.* 3:16(a). Here, however, we hold that the trial court did not commit reversible error in proceeding with the pretrial motions in defendant's absence. Because the motions centered on questions of law, defendant's presence was not constitutionally required. *State v. Auld,* 2 *N.J.* 426, 433, 67 *A.*2d 175 (1949). The traditional justifications underlying defendant's right to be present, specifically the right to assist counsel in his defense, to assist in the cross-examination of witnesses, and to influence the jury psychologically by his presence, *see Hudson, supra,* 119 *N.J.* at 172, 574 *A.*2d 434, were absent. *See Kentucky v. Stincer, supra,* 482 *U.S.* at 745, 107 *S.Ct.* at 2667, 96 *L. Ed.*2d at 647 (holding Confrontation Clause not violated when defendant's absence does not deprive him of opportunity to cross-examine witnesses effectively); *Snyder, supra,* 291 *U.S.* at 106–07, 54 *S.Ct.* at 332, 78 *L. Ed.* at 678 (holding defendant's presence not required when useless or of no tangible benefit); *State v. Hammond,* 231 *N.J.Super.* 535, 541, 555 *A.*2d 1169 (App.Div.1989) (finding no error in defendant's involuntary absence during jury charge).

## VI. *The Surgical Gloves*

Defendant contends that the court committed reversible error by admitting the recovered surgical gloves into evidence. At the guilt phase, defendant made no objection to the admission of the gloves. During the penalty phase, however, defendant objected to their admission as irrelevant. Defendant now argues that the State failed to provide a proper chain of custody for the gloves. He also argues that the tear in one glove's index finger, which was not discovered until after the FBI had performed its tests, established tampering sufficient to preclude the admission of that glove. Governing our review of this claim is the plain error standard, which requires the admission of the gloves "to have been clearly capable of producing an unjust result." *R.* 2:10–2. We find no such error.

Through the testimony of each officer who possessed the gloves, the State established an unbroken chain of custody. *See State v. Brown,* 99 *N.J.Super.* 22, 27, 238 *A.*2d 482 (App.Div.), *certif. denied,* 51 *N.J.* 468, 242 *A.*2d 16 (1968). Each glove was placed in a marked envelope and transferred among authorized law enforcement agents. *See State v. Johnson,* 90 *N.J.Super.* 105, 114–15, 216 *A.*2d 397 (App.Div.1965), *aff'd,* 46 *N.J.* 289, 216 *A.*2d 392 (1966). Ample evidence supports the trial court's finding that the State proved an unbroken chain of custody. *See Brown, supra,* 99 *N.J.Super.* at 27, 238 *A.*2d 482 ("Whether the requisite chain of possession has been sufficiently established to justify admission of the exhibit is a matter committed to the discretion of the trial judge, and his determination will not be overturned in the absence of a clearly mistaken exercise thereof."); *see also State v. Farfalla,* 113 *N.J.Super.* 557, 559–60, 274 *A.*2d 601 (App.Div.) (citing *Brown* with approval for the proposition that admissibility in a case involving a contested chain of custody involves an exercise of the trial court's discretion), *certif. denied,* 58 *N.J.* 394, 277 *A.*2d 886 (1971). "Furthermore, a defect in the chain of custody goes to the weight, not the admissibility, of the evidence introduced." *United States v. Matta–Ballesteros,* 71 *F.*3d 754, 769

(9th Cir.1995) (discussing admissibility under standard of *Federal Rule of Evidence* 901), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 965, 136 *L. Ed.*2d 850 (1997); *see also Biunno, Current N.J. Rules of Evidence,* 1991 Supreme Court Committee Comment on *N.J.R.E.* 901 (1995) ("Rule 901 generally follows Fed.R.Evid. 901....").

■ In addition, the fact that the FBI was the first to note the tear in one glove is not a sufficient reason to preclude the gloves' admission into evidence. Everyone who possessed the glove testified that he had not tampered with it. The FBI experts, a DNA analyst and a fingerprint analyst, testified that they did not tear the glove during the testing procedures. Because the custodians were law enforcement officers, moreover, the prosecutor was not obligated "to negate every possibility of substitution or change in condition of the evidence." *State v. Brunson,* 132 *N.J.* 377, 393, 625 *A.*2d 1085 (1993).

Through cross-examination, defendant raised the possibility that law enforcement agents had torn the gloves. For example, under examination by defense counsel, the FBI fingerprint analyst conceded that experts accidentally have torn evidence during testing in other cases. Such concerns, however, go to the weight, not the admissibility of evidence. *Brown, supra,* 99 *N.J.Super.* at 27–28, 238 *A.*2d 482. Thus, we reject defendant's claim of error.

VII. *Defendant's In–Custody Statements*

Defendant argues that the trial court should have suppressed his statements made while in police custody as involuntary, coerced, and unreliable. He contends that he was interrogated in isolation for an excessive period of time; his waiver of *Miranda* rights was inadequate; he was intimidated by the police's administration of polygraph tests; he was subjected to psychological ploys that manipulated him into incriminating himself; and he was particularly susceptible to police coercion because of his low intelligence.

The testimony of the State's witnesses was essentially the same at both the suppression hearing and at trial. Shortly after 11:10

a.m., Officer Snow arrested defendant for a motor vehicle violation. Snow then transported defendant to the prosecutor's office. Captain King and Detective Stefanoni began questioning defendant at 11:40 a.m. The officers testified that they administered *Miranda* warnings, that defendant understood his rights, and that he signed a waiver form. For the first two hours and thirteen minutes, the interrogation was not taped. When King threatened to end the interview, defendant agreed to cooperate and give a taped statement.

Defendant's first taped statement mirrored his previous, untaped statements. Afterwards, defendant listened to the tape to review its contents. Captain Scara then spoke to defendant and conducted three polygraph tests. Defendant declined King's offer of refreshments.

At 7:45 p.m., King resumed questioning defendant. King told defendant he did not believe defendant's statement was true. Defendant then admitted that he had lied in the first statement and that he had stabbed Eck. He then gave the second taped statement. In that statement, he acknowledged that he had been advised of his *Miranda* rights and had been offered food and drink while in police custody. Defendant finished his statement at 9:01 p.m.

At the suppression hearing, King testified that defendant never requested an attorney, never exercised his right to remain silent, and never asked to end the interrogation. Not until the following day did defendant invoke his right to remain silent. The police honored his request.

Defendant's version of events differed markedly. At the suppression hearing, defendant testified that he was not given *Miranda* warnings on the morning of his arrest. He denied his signature on both the *Miranda* waiver card and on the polygraph-examination-waiver form. At trial, the prosecutor introduced a document with a matching signature that defendant admitted to have signed before the incident. Defendant admitted to signing consent-to-search forms, but denied it was his signature on the

forms produced at trial. He claimed that Captain King had told him that he could not end the interrogation unless he passed a polygraph test. He also claimed that King denied his request for counsel. He argued that the taped statements produced at trial contained material omissions and fabrications.

The court denied defendant's motion to suppress and held that the police had probable cause to arrest and interrogate him. It found no coercion, fraud, or suggestive questioning, and held that defendant was apprised of, and knowingly and intelligently waived, his *Miranda* rights. The court noted that defendant was given the opportunity to eat and drink and that he never requested an attorney. Finally, the court found defendant's testimony regarding the allegedly fraudulent tapes and *Miranda* violation to be incredible.

▪▪▪ We reject defendant's claim that the court erred in denying defendant's motion to suppress his taped statements. Ample evidence supports the trial court's conclusion that defendant had waived his *Miranda* rights. Defendant's own signatures and recorded statement support the trial court's conclusion.

▪▪▪ The trial court further found that the State had proved that defendant's confession was voluntary beyond a reasonable doubt. *State v. Galloway*, 133 *N.J.* 631, 654, 628 *A.*2d 735 (1993). In making this determination, the court was obligated to take into account the "totality of the circumstances," including defendant's "age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved." *Ibid.*

▪▪▪ Defendant's limited intelligence did not preclude a determination that his statements were given voluntarily. He was twenty-five years old, had graduated from high school, and completed a course in law enforcement. In light of these facts, we hold that defendant could appreciate the significance of waiving his constitutional rights. His invocation of his right to remain

silent on the day after his arrest further illustrates this comprehension.

■ The fact that the police used psychological ploys, such as threats to end the interrogation and the feigned destruction of defendant's first taped confession, does not render his confession involuntary. *See Galloway, supra,* 133 *N.J.* at 654, 628 *A.*2d 735 ("Unlike the use of physical coercion, however, use of a psychologically-oriented technique during questioning is not inherently coercive.").

■ Likewise, subjecting defendant to polygraph tests did not impugn the voluntariness of his confession. The interrogating officers advised defendant of his right to refuse to take the test, to discontinue the test, and to refuse to answer any question during the test. *See United States v. Little Bear,* 583 *F.*2d 411, 414 (8th Cir.1978). Immediately before testing defendant, the police reissued *Miranda* warnings to him, and he signed a polygraph waiver form. Because the officers adequately apprised defendant of his rights regarding the polygraph tests, the tests did not render his confession involuntary or coerced. *See Gerald, supra,* 113 *N.J.* at 120–21, 549 *A.*2d 792 (holding that a confession was voluntary although it was given after the defendant was informed that he failed a polygraph test).

■ Defendant argues that, because he spent nine and one-half hours at the police station, his confessions were involuntary. During this time, however, the interrogating officers apprised defendant of his rights on more than one occasion and offered him food and drink. In light of these facts, we decline to hold defendant's inculpatory statements involuntary based on the amount of time he spent in custody. *See, e.g., State v. James,* 237 *Conn.* 390, 678 *A.*2d 1338, 1357 (1996) (holding that a fourteen-hour interrogation yielded a voluntary confession); *People v. Bounds,* 171 *Ill.*2d 1, 215 *Ill.Dec.* 28, 662 *N.E.*2d 1168, 1180–81 (1995) (holding that an eight-hour interrogation yielded a voluntary confession), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 197, 136 *L.*

*Ed.*2d 133 (1996); *People v. Sobchik,* 228 *A.D.*2d 800, 644 *N.Y.S.*2d 370, 372 (1996) (holding that a nine-hour interrogation during which defendant was connected to a polygraph machine yielded a voluntary confession); *Higgins v. State,* 889 *P.*2d 964, 967 (Wyo. 1995) (holding that seven and one-half hours of interrogation within an eleven-hour period yielded a voluntary confession).

### VIII. *Non–Severance of Chrostowski–Incident Counts*

█ We reject defendant's argument that the trial court denied him a fair trial by not severing the counts relating to the Chrostowski stabbing from those relating to Eck's murder. Joinder is permitted when two or more offenses "are of the same or similar character or are based on . . . 2 or more acts or transactions connected together or constituting parts of a common scheme or plan." *R.* 3:7–6. Defendant admitted in his second taped statement that he and Bryant had planned to commit robberies that evening and that they armed themselves with knives for that purpose. Both attacks involve common circumstances and took place within two hours of each other, further indicating that they were part of a "common scheme." *See State v. Long,* 119 *N.J.* 439, 475–76, 575 *A.*2d 435 (1990) (upholding joinder for two shootings, the latter one fatal, occurring more than two hours apart); *State v. Hardison,* 204 *N.J.Super.* 1, 10, 497 *A.*2d 868 (App.Div.1983) (holding two armed robberies committed within an hour to be part of a common plan or scheme), *aff'd,* 99 *N.J.* 379, 492 *A.*2d 1009 (1985).

█ Even if tried separately, the Chrostowski attack would have been admissible as probative of defendant's motive, intent, preparation, and plan to commit armed robberies that evening. *N.J.R.E.* 404(b). Thus, the court properly joined the two indictments. *See State v. Oliver,* 133 *N.J.* 141, 151, 627 *A.*2d 144 (1993); *State v. Pitts,* 116 *N.J.* 580, 601–02, 562 *A.*2d 1320 (1989). Defendant's and Bryant's aborted attempt to rob Chrostowski was part of their common plan. The plan included their action at the

Francine's nightclub and culminated in the stabbing and robbery of Eck.

Accordingly, we hold that the court acted within its sound discretion in denying defendant's severance motion. *See State v. Chenique–Puey*, 145 *N.J.* 334, 341, 678 *A.*2d 694 (1996); *State v. Erazo*, 126 *N.J.* 112, 131, 594 *A.*2d 232 (1991).

IX. *Challenged Evidentiary Rulings*

A. *Defendant's Plan to Commit Other Crimes*

█ Defendant objects to the admission of evidence that he and Bryant planned to commit other crimes, including robbing a bank or another gas station. In his second taped statement, defendant confessed to such plans. The trial court, however, held that the relevance of the plan to defendant's state of mind outweighed its prejudicial effect. *See N.J.R.E.* 404(b). This decision did not constitute an abuse of the trial court's discretion. *See State v. Marrero*, 148 *N.J.* 469, 505, 691 *A.*2d 293 (1997).

█ Defense counsel did not request a limiting instruction at either the guilt or penalty phases. Such an instruction could have advised the jury to use the evidence only in determining defendant's motive, intent, and state of mind, and not as suggesting defendant's predisposition to commit the robbery and murder for which he was charged. *See State v. Nance*, 148 *N.J.* 376, 391, 689 *A.*2d 1351 (1997). The State did not reintroduce the evidence that defendant and Bryant planned other robberies at the penalty phase. At the penalty phase, the court instructed the jury to disregard the Chrostowski robbery and not to consider any aggravating factor other than those proposed by the State. Against that background, we do not find plain error in the court's failure to provide a limiting instruction dealing specifically with defendant's plans to rob a bank or another gas station. *R.* 2:10–2; *see also Loftin, supra,* 146 *N.J.* at 396, 680 *A.*2d 677 (noting defense counsel specifically requested that no limiting instruction be given for fear such instruction would work to defendant's detriment); *cf. Rose, supra,* 112 *N.J.* at 505–08, 548 *A.*2d 1058 (finding reversible

error in absence of any limiting instruction regarding the extensive, provocative other-crimes evidence, which was introduced at the penalty phase).

B. *Defendant's Racist Statements*

Defendant argues that two statements made by Bennett in her testimony unduly prejudiced him. Bennett testified regarding conversations with defendant and Bryant in which they confessed to stabbing Eck. On direct examination, Bennett testified that defendant boasted, in reference to the Eck stabbing, that there was "one less cracker that he would have to worry about." Outside the presence of the jury, defense counsel objected to this comment as prejudicial. The court overruled the objection. On cross-examination, Bennett testified that Bryant told her that Eck had called him "nigger" while being stabbed. On redirect, Bennett testified that defendant and Bryant had killed Eck because they did not like white people. Defense counsel made no objection to this statement.

In overruling defendant's objection to Bennett's first statement, the trial court held that the comment related to motive, was probative, and was not unduly inflammatory. *See N.J.R.E.* 403. Traditional rules of appellate review require substantial deference to a trial court's evidentiary rulings. *See Marrero, supra,* 148 *N.J.* at 505, 691 *A.2d* 293; *McDougald, supra,* 120 *N.J.* at 577–78, 577 *A.2d* 419; *State v. Carter,* 91 *N.J.* 86, 106, 449 *A.2d* 1280 (1982). Defendant's statement suggests his knowledge that Eck would die from his wounds and tends to prove that defendant intended to kill Eck. Although the statement carried racist undertones, we cannot say that the trial court erred in ruling that the possibility of prejudice did not substantially outweigh its probative value. *Carter, supra,* 91 *N.J.* at 106, 449 *A.2d* 1280 ("The party seeking to preclude the admission of evidence must convince the court that the factors favoring exclusion substantially outweigh the probative value of the contested evidence."); *Biunno, supra,* comment 1 on *N.J.R.E.* 403. The mere possibility that evidence

could be prejudicial does not justify its exclusion. *State v. Bowens*, 219 *N.J.Super.* 290, 296–97, 530 *A.2d* 338 (App.Div.1987) ("Damaging evidence usually is very prejudicial but the question here is whether the risk of *undue* prejudice was too high."). We find that the trial court's decision to allow the statement in evidence was not a clear error of judgment and did not result in a manifest denial of justice. *See Koedatich I, supra,* 112 *N.J.* at 313, 548 *A.2d* 939; *Carter, supra,* 91 *N.J.* at 106, 449 *A.2d* 1280.

▆ Nor do we find plain error in the admission of Bennett's statement that defendant and Bryant said they killed Eck because they did not like white people. *R.* 2:10–2. The prosecutor elicited this testimony in response to other testimony elicited by defense counsel on cross-examination of Bennett suggesting that Eck called Bryant "nigger" while being stabbed. Defense counsel thus opened the door for the prosecutor's line of questioning. Moreover, the prosecutor never referred to Eck's or defendant's comments during either the guilt-phase or penalty-phase summation. In fact, the prosecutor, in his guilt-phase summation, specifically told the jury that the case was "not about race, [but was] about taking a long, hard, dispassionate look at the evidence." Furthermore, evidence of defendant's negative opinions toward white people was placed before the jury by defense counsel in the penalty phase through the mitigation book, which contained three sections that discussed his animosity. In light of these factors, we find that the admission of Bennett's statements did not possess the clear capacity to produce an unjust result.

C. *The 9–1–1 Tape*

▆ We also reject defendant's argument that the admission of the tape of Eck's 9–1–1 phone call at the guilt and penalty phase was prejudicial. In the guilt phase, the tape provided an auditory reconstruction of the crime scene that corroborated other testimony. *See State v. King,* 215 *N.J.Super.* 504, 517–18, 522 *A.2d* 455 (1987). It also supported the testimony of Benjamin Outlaw, whose car horn can be heard in the background of the tape.

Outlaw testified at trial that he witnessed defendant's car speed from the Amoco station just before Outlaw entered. He testified further that, because no attendant came to assist him at the pump after he arrived at the station, he honked his horn.

The tape was also probative at the penalty phase because it demonstrated Eck's suffering. The severity of Eck's pain is an element of the "torture or depravity" aggravating factor submitted by the State. *See Ramseur, supra,* 106 *N.J.* at 211, 524 *A.*2d 188. On the tape, Eck is out of breath and gasping only "Delanco Amoco." Because Eck left the phone off the hook, the tape reflects the amount of time after he called that he had to wait before help arrived.

In light of the probative nature of the 9-1-1 tape at both the guilt phase and penalty phase, we find that the trial court acted within its discretion in admitting the tape into evidence. *See Carter, supra,* 91 *N.J.* at 106, 449 *A.*2d 1280.

D. *The Autopsy Photographs*

Defendant contends that the court's decision to admit ten autopsy photographs of Eck was prejudicial and denied him a fair trial. Seven of the pictures depicted the stab wounds on Eck's body. One picture depicted the wound on Eck's heart, which was held in the hands of the medical examiner. Two other pictures depicted the wounds to Eck's liver. These pictures were displayed to the jury on a video projection screen. In some of the pictures, dried blood was visible on Eck's body. We conclude that the pictures were relevant in both the guilt phase and penalty phase, and that the admission of the photographs did not constitute an abuse of discretion.

At the guilt phase, the photos corroborated the medical examiner's testimony and supported his conclusion that the stab wound to the heart was fatal and that the two wounds to the liver independently would have caused Eck's death. In addition, the pictures corroborated defendant's confession. The fact that Eck had been stabbed twenty-four times, including once in the heart and twice in

the liver, supported the inference that defendant committed the murder purposefully or knowingly. *See McDougald, supra*, 120 *N.J.* at 583, 577 *A.*2d 419 (upholding the admission of eight autopsy photographs offered to prove that the defendant purposefully or knowingly killed the victim).

At the penalty phase, the photographs were relevant to the "torture or depravity" aggravating factor. The fact that Eck had been stabbed twenty-four times, including several times in the genital area, tends to prove that Eck suffered severe physical pain and supports the inference that defendant intended to inflict severe pain. *See State v. Moore*, 122 *N.J.* 420, 469, 585 *A.*2d 864 (1991) (holding that autopsy photographs were relevant to the "torture or depravity" aggravating factor); *Bey II, supra*, 112 *N.J.* at 183, 548 *A.*2d 887 (determining that photographs offered in support of the "torture or depravity" aggravating factor must relate to the defendant's intent or the victim's pain).

The relevance of these photographs was not outweighed by their potential to prejudice the jury. *See N.J.R.E.* 403. Although some photographs revealed dried blood and depicted the interior of Eck's body, "[t]he presence of blood and gruesome details are not *ipso facto* grounds for exclusion." *DiFrisco II, supra*, 137 *N.J.* at 500, 645 *A.*2d 734 (upholding admission at the penalty phase of a photograph of the victim lying in a pool of blood and an x-ray revealing three bullets lodged in his skull); *see also Cooper, supra*, 151 *N.J.* at 394, 700 *A.*2d 306 (upholding the penalty-phase admission of an autopsy photograph of a six-year-old victim of murder and sexual assault lying on her stomach with her legs spread); *Savage, supra*, 120 *N.J.* at 632–33, 577 *A.*2d 455 (upholding the admission at both phases of pictures of the victim's dismembered torso); *McDougald, supra*, 120 *N.J.* at 583, 577 *A.*2d 419 (upholding the admission at both phases of eight photos, including one with a baseball bat protruding from the victim's vagina); *Moore, supra*, 113 *N.J.* at 296, 550 *A.*2d 117 (upholding penalty-phase admission of pictures of victim that included blood stains).

## X. *Alleged Prosecutorial Misconduct*

Defendant argues that the prosecutor's statements in the guilt-phase and penalty-phase summations constituted prosecutorial misconduct requiring reversal of his conviction and death sentence. We disagree.

The guilt-phase summation statements include the prosecutor's reference to defendant as a "cold-blooded killer," and his description of defendant's testimony as "nothing more than a self-serving pack of lies." Although arguments in summation must be limited to the evidence and inferences reasonably drawn therefrom, the prosecutor may forcefully and vigorously present the State's case. *Chew, supra,* 150 *N.J.* at 84, 695 *A.*2d 1301. In his second taped statement, defendant himself described his lack of emotion while stabbing Eck, comparing himself to a mafia hit man and describing his conduct as "businesslike." Those who witnessed defendant at the hospital shortly after Eck's murder testified regarding his calm demeanor. The prosecutor's statement was a permissible response to defense counsel's summation argument that defendant's stoic demeanor, when compared to Bryant's frenzied behavior, indicated that Bryant, not defendant, committed the murder. Because the prosecutor's labeling of defendant as a "cold-blooded killer" was supported by the evidence and was made in response to defense counsel's argument, it does not constitute reversible error. *See, e.g., United States v. Pungitore,* 910 *F.*2d 1084, 1127 (3rd Cir.1990) (holding that, when supported by the evidence, prosecutor's reference to defendant as a "cold-blooded killer" did not constitute prosecutorial misconduct), *cert. denied,* 500 *U.S.* 915, 111 *S.Ct.* 2009, 114 *L. Ed.*2d 98 (1991); *Brennan v. State,* 639 *N.E.*2d 649, 652–53 (Ind.1994) (same); *Stouffer v. State,* 738 *P.*2d 1349, 1357 (Okla.Crim.App. 1987) (same), *cert. denied,* 484 *U.S.* 1036, 108 *S.Ct.* 763, 98 *L. Ed.*2d 779 (1988).

Nor was it reversible error for the prosecutor to call defendant's testimony a "self-serving pack of lies." Defendant's testimony at trial conflicted with that of each of the State's

witnesses and with his own taped statement. The prosecutor did not vouch for the State's witnesses, offer a personal opinion of defendant's veracity, or refer, explicitly or implicitly, to matters outside of the record. *See Marshall I, supra,* 123 *N.J.* at 156, 586 *A.*2d 85. In brief, the prosecutor's comment was based on reasonable inferences drawn from the evidence presented during the trial. *See Chew, supra,* 150 *N.J.* at 84, 695 *A.*2d 1301.

During the penalty-phase summation, the prosecutor referred to the fact that defendant never disputed Bryant's statement that defendant had stabbed Eck in the genitals. The prosecutor, in disputing defense counsel's argument that defendant's involvement was based solely on Bryant's bad influence, stated, "What evidence did you hear to suggest any of that? None. What did you hear Robert Morton say? 'Alonzo goes his way, I go mine. Alonzo doesn't make me do anything I don't want to do.' "

Defense counsel did not object to the prosecutor's comments at trial. Defendant now argues, however, that those statements improperly commented on his absence from trial and on his decision not to make a statement in allocution. Clearly, this was not the case. The prosecutor's reference to defendant's failure to respond to Bryant's statement was not based on defendant's absence or failure to speak, but on his adoption by silence of Bryant's statement. In fact, the prosecutor's comment expressly referred to a statement made by defendant in his second taped confession. Thus, the prosecutor's comment that the jury did not "hear" evidence supporting the defense argument was not a comment on defendant's absence or failure to exercise his right of allocution. Furthermore, defendant would not have been permitted to deny his guilt or contest the testimony of the State's witnesses during allocution. *See State v. Zola,* 112 *N.J.* 384, 430–32, 548 *A.*2d 1022 (1988). We hold that the prosecutor's comments did not deprive defendant of a fair trial and do not constitute grounds for reversal. *See R.* 2:10–2; *State v. Harvey,* 151 *N.J.* 117, 216, 699 *A.*2d 596 (1997).

## XI. *Alleged Jury–Related Errors*

### A. *Jury Selection*

Defendant argues that the court committed reversible error when selecting the jury. Specifically, defendant contends that the court erred in excusing five potential jurors because of their anti-death-penalty views and by seating two jurors whose pro-death-penalty views impaired their ability to weigh the aggravating and mitigating evidence impartially. On reviewing defendant's claims and the individual *voir dire* of the challenged jurors, we conclude that the court did not abuse its discretion in its decisions regarding these prospective jurors. *See DiFrisco II, supra,* 137 *N.J.* at 459, 645 *A.*2d 734 (noting that "trial courts possess considerable discretion in determining the qualifications of prospective jurors"); *State v. Martini,* 131 *N.J.* 176, 219, 619 *A.*2d 1208 (1993) (*Martini I* ) (same).

During *voir dire,* the five excused jurors expressed doubts about their ability to impose the death sentence on even a death-eligible defendant. *See Feaster, supra,* 156 *N.J.* at 55, 716 *A.*2d 395 (upholding dismissal of juror who expressed doubts over whether she could vote for a death sentence); *Harris, supra,* 156 *N.J.* at 167–69, 716 *A.*2d 458 (same); *Martini I, supra,* 131 *N.J.* at 217–19, 619 *A.*2d 1208 (same). The two jurors seated by the court did not say anything suggesting that they would automatically impose the death penalty on a guilty defendant or that they could not evaluate the aggravating and mitigating factors fairly. Defendant, moreover, did not exercise five of his twenty allotted peremptory challenges. He could have excused the jurors whose qualifications he now disputes. Indeed, defendant argues his trial counsel was ineffective in failing to exercise the peremptory challenges against those jurors. On this record, the argument is premature. Defendant may raise the argument again on post-conviction relief. *See Preciose, supra,* 129 *N.J.* at 460, 609 *A.*2d 1280; *Dixon, supra,* 125 *N.J.* at 261–62, 593 *A.*2d 266.

The dissent argues that the trial court's *voir dire* concerning possible racial bias was insufficiently "rigorous" for a case involving a black defendant and a white victim. *Post* at 484–86, 715 A.2d at 279–80. Defendant, however, has not raised that issue before the trial court or this Court. Nothing, moreover, indicates that any juror was racially biased. Absent any evidence, we decline to presume racial bias in the jury.

### B. *Alleged Jury Misconduct*

 Defendant also argues that the jury discussed the case before deliberations, in violation of the court's instructions, thereby denying him an impartial jury. Defendant bases this argument on the fact that the jury, just before the guilt-phase summations, sent a note to the court asking why defendant did not swear before the court that his testimony would be truthful. In response, the court noted that defendant's personal religious beliefs precluded him from swearing an oath. It explained that defendant's affirmation was the equivalent to an oath. This exchange between the court and jury does not suggest that the jurors had begun deliberations prematurely.

### XII. *Alleged Penalty–Phase Errors*

### A. *Excluded Evidence*

With regard to the penalty phase, defendant raises two evidentiary points. The first concerns photographs of defendant, depicting him as a youth with his mother, at his prom, and at his wedding. Defendant's trial counsel, however, withdrew the photographs when the prosecutor objected to their admission. Consequently, the court never ruled on the admissibility of the photographs, and the issue is not preserved for this appeal.

Defendant also objects to the trial court's refusal to allow him to admit the verified complaint filed in a divorce proceeding by Michael Eck's ex-wife, Maria Kuo–Eck. In those papers, Kuo–Eck, an Asian–American, alleged that Eck had engaged in a pattern of racist, verbal abuse against her, praised Adolf Hitler,

and castigated people of Jewish, Asian, and African ancestry. Kuo–Eck's matrimonial attorney, William Buckman, represented co-defendant Bryant in Bryant's trial for the Eck murder. On learning that Buckman planned to use her complaint in defense of Bryant and defendant, Kuo–Eck filed a certification expressing her objection to such use.

The trial court excluded the complaint, ruling that it was irrelevant because it did not tend to prove that at the time of the attack Eck had made any racist statements. The court also reasoned that, just as the prosecution is not permitted to submit evidence designed to build sympathy for the victim, defendant "can't slander the victim in order to alienate the Jury."

A defendant is permitted to "offer, without regard to the rules governing the admission of evidence at criminal trials, reliable evidence relevant to any of the mitigating factors." *N.J.S.A.* 2C:11–3c(2)(b). As relaxed as this standard may be, it does not provide for the automatic admission of all evidence a defendant offers. *State v. Davis,* 96 *N.J.* 611, 623–24, 477 *A.*2d 308 (1984). In its discretion, the court may exclude evidence if its probative value is substantially outweighed by its unfounded or speculative character or by the risk that it would cause confusion. *Ibid.* Generally, evidence of a victim's character is admissible only to a limited extent at the penalty phase. *State v. Muhammad,* 145 *N.J.* 23, 47–48, 678 *A.*2d 164 (1996) (allowing courts to limit victim-impact statements). The probative value of the complaint was so slight that it could not have had a substantial effect on the jury's penalty-phase deliberations. Thus, any error resulting from the exclusion of the papers was harmless. *See Loftin, supra,* 146 *N.J.* at 355–56, 680 *A.*2d 677.

B. *The Penalty–Phase Jury Charge*

On appeal, defendant argues for the first time that the penalty-phase jury charge was fatally deficient in two respects. First, he notes that the court failed to define "purpose" when instructing the jury on the "escaping apprehension" aggravating factor. *See*

*N.J.S.A.* 2C:11–3c(4)(f). Second, he contends that the charge failed to instruct the jury that it could not double-count evidence in support of multiple aggravating factors.

■ Although the court did not define "purpose" in its instruction on the "avoid apprehension" factor, this omission was not plain error. *See R.* 2:10–2. Three days earlier, the court defined "purpose" six times in the guilt-phase charge. *Cf. Cooper, supra,* 151 *N.J.* at 385, 700 *A.2d* 306 (noting, in upholding penalty-phase charge that omitted definition of "purpose," that "purpose" had been defined repeatedly during the guilt phase). In addition, the prosecutor discussed "purpose" in both his penalty-phase opening statement and summation. *Cf. ibid.* (noting defense counsel's discussion of "purpose" during penalty-phase summation). "Given the repeated reference to and definitions of the terms, the jury almost certainly knew what 'purpose' meant and presumably applied it faithfully during its penalty-phase deliberations." *Id.* at 385–86, 700 *A.2d* 306.

■ We find no error in the court's failure to instruct the jury not to double-count evidence in support of more than one aggravating factor. The court correctly informed the jury that its process of weighing the aggravating and mitigating factors was a qualitative one.

> The weighing process, the balancing of the aggravating and mitigating factors is not mechanical or numerical in nature. You do not count factors, you consider them qualitatively. The answers depend upon your exercise of careful and considered judgment. One aggravating factor may be found to outweigh beyond a reasonable doubt numerous mitigating factors. Similarly, many aggravating factors may be found not to outweigh a single mitigating factor. Essentially, it's a matter addressed to your human judgment as mature people. You make a decision based upon qualitative judgment as to what the appropriate penalty should be.
>
> When it's here, the prosecution uses the same evidence or some of the same evidence in seeking to prove multiple aggravating factors, and you found multiple aggravating factors have been proved by the same evidence. It's particularly important to remember that you may not simply compare the number of aggravating factors against the number of mitigating factors. Rather—remember that in such an instance you're considering the same facts more than once, because the same facts are being used to prove more than one aggravating factor. So, I think that is fairly sensible. You have to consider the factors, you don't in any way count

the number of factors and compare three aggravating factors against three mitigating. It's a qualitative analysis.

But if more than one aggravating factor is based upon the same facts, then you want to be aware that under these you only really need one set of facts, and it may mean that the aggravating factors have less weight than may otherwise be the case.

The charge comports with our prior holding that the trial court should advise

the jury that it should not simply compare the number of aggravating factors against the number of mitigating factors, that it is considering the same facts more than once, and that it should be cognizant that the same facts are being used to prove more than one aggravating factor. This result permits the jury to consider the evidence relevant to each aggravating factor, and should prevent it from giving undue weight to the number of factors when one aspect of the defendant's conduct supports multiple aggravating factors.

[*Bey II, supra,* 112 *N.J.* at 176, 548 *A.*2d 887].

■ Properly instructed, the jury was not precluded from using the same evidence to find multiple aggravating factors. *Martini I, supra,* 131 *N.J.* at 287, 619 *A.*2d 1208; *Bey II, supra,* 112 *N.J.* at 176, 548 *A.*2d 887.

## C. *The "Torture or Depravity" Aggravating Factor*

■ Defendant challenges the submission of the "torture or depravity" aggravating factor to the jury, arguing that it was not supported by sufficient evidence. *See N.J.S.A.* 3C:11–3c(4)(c) ("The murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim."). We disagree. Although the fact that Eck was stabbed twenty-four times by itself may not justify submission of this aggravating factor, *see Erazo, supra,* 126 *N.J.* at 138, 594 *A.*2d 232, other evidence supported the conclusion that defendant "inflict[ed] pain incremental to that attributable to the act of killing." *Ibid.* Specifically, the medical examiner testified that Eck had been stabbed in the genitals. Other testimony suggested that defendant inflicted these wounds "for good measure." *Cf. State v. Hunt,* 115 *N.J.* 330, 389, 558 *A.*2d 1259 (1989) ("[M]ultiple stab wounds, when combined with other evidence of defendant's intent, could support the contention that defendant knew or intended that the victim would suffer. . . .").

We hold that defendant's intent to inflict pain additional to that of the murder itself can be inferred from the circumstances of this case. *See Erazo, supra,* 126 *N.J.* at 137, 594 *A.*2d 232 (noting evidence of torture can be inferred from circumstances of the case); *Ramseur, supra,* 106 *N.J.* at 211 n. 38, 524 *A.*2d 188 (noting that, in most cases, proof of "torture or depravity" factor will be "totally circumstantial"). Thus, it was not error for the court to submit this factor to the jury for consideration.

### XIII. *Other Alleged Errors*

#### A. *Constitutionality and Proportionality Review*

We reject defendant's argument that the New Jersey death-penalty statute is unconstitutional. *See Cooper, supra,* 151 *N.J.* at 379, 700 *A.*2d 306; *Ramseur, supra,* 106 *N.J.* at 166–211, 524 *A.*2d 188. We will conduct the proportionality review of his sentence, *N.J.S.A.* 2C:11–3e, in a separate proceeding.

#### B. *Defendant's Non–Capital Sentence:*

Defendant argues that his non-capital sentence was excessive. For the robbery of Eck, the court found one aggravating factor, the nature and circumstances of the offense. *See N.J.S.A.* 2C:44–1a(1). In support of the mitigating factors pertaining to excuse or justification, the court referred to defendant's emotional problems and developmental disabilities. It also found defendant's lack of a prior criminal record to be a mitigating factor. It concluded, however, that the aggravating factor outweighed the mitigating factors. The court sentenced defendant to twenty years imprisonment with a ten-year parole disqualifier.

For the robbery of Chrostowski, the court again found the nature and circumstances of the offense to be an aggravating factor. Although the court believed that Bryant had stabbed Chrostowski, it found that defendant was aware of the high risk and degree of harm and that he intended to inflict serious injury on the victim. *See N.J.S.A.* 2C:44–1a(2). The court found the same mitigating factors as it found present in the Eck robbery.

The court again found the aggravating factor to outweigh the mitigating factors. It sentenced defendant to twenty years imprisonment with a ten-year parole disqualifier to be served consecutively to the non-capital sentence for the Eck robbery. The other counts against defendant were dismissed due to merger.

We hold that the trial court appropriately sentenced defendant. For each non-capital count, defendant received the maximum permissible sentence under the guidelines. *See N.J.S.A.* 2C:43–6a(1). The trial court properly weighed the aggravating and mitigating factors. *See State v. O'Donnell,* 117 *N.J.* 210, 216, 564 *A.*2d 1202 (1989). The sentence imposed was not "clearly unreasonable so as to shock the judicial conscience." *State v. Roth,* 95 *N.J.* 334, 365, 471 *A.*2d 370 (1984). We find no reason to disturb the sentence imposed by the trial court. *See State v. Roach,* 146 *N.J.* 208, 230, 680 *A.*2d 634, *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 540, 136 *L. Ed.*2d 424 (1996); *Roth, supra,* 95 *N.J.* at 365, 471 *A.*2d 370.

## XIV. *The State's Cross–Appeal*

Defendant submitted under the "catch-all" mitigating factor, *N.J.S.A.* 2C:11–3c(5)(h), the fact that "Robert Morton will die in prison prior to first becoming eligible for parole." The prosecutor did not object.

In the mitigation book, the defense listed the maximum sentence and maximum period of parole ineligibility for defendant's non-capital convictions. Based on the assumption that defendant would receive the maximum sentences, the defense stated that defendant would become eligible for parole on February 25, 2048, twelve years beyond defendant's life expectancy. In the mitigation book, the defense stated, "ROBERT MORTON WILL DIE IN PRISON." In support of this claim, the defense attached a life expectancy table.

The court overruled the prosecutor's objection to the inclusion of those items in the mitigation book. In the penalty-phase charge, the court informed the jury of the maximum sentences defendant could receive on the non-capital charges and explained

to the jury that the possible sentences should not influence the capital sentencing determination.

As required, the court informed the jury of defendant's potential non-capital sentences, including the possible period of parole ineligibility. *See Martini I, supra,* 131 *N.J.* at 313, 619 *A.*2d 1208. Parole ineligibility, however, is not a mitigating factor. *Cooper, supra,* 151 *N.J.* at 404–05, 700 *A.*2d 306; *State v. Bey,* 129 *N.J.* 557, 603, 610 *A.*2d 814 (1992) (*Bey III* ). "Indeed, it would lead to an incongruous result to permit parole ineligibility to be used as mitigating evidence, because the more crimes a defendant committed, the more mitigating evidence he or she would be able to submit." *Cooper, supra,* 151 *N.J.* at 405, 700 *A.*2d 306. For this reason, we conclude that the court erred in allowing defendant to submit his parole ineligibility as mitigating evidence. In light of the fact that the jury imposed the death penalty, however, the error was harmless.

The judgment of conviction and sentences, including the sentence of death, are affirmed.

HANDLER, J., dissenting in part.

Unmoved by the absence of both defendant and competent defense counsel at the penalty phase, the Court upholds defendant's death sentence. In so doing, the Court devalues the need, when a capital defendant's life is at stake, for a reliable, individualized sentencing determination. The trial court's uncritical acceptance of defendant's woefully inadequate waiver was erroneous. Defense counsel's inability to place any witnesses on the stand prejudicially plagued the penalty phase. Without either defendant or any proficient defense attorneys, the penalty phase was a travesty. Nevertheless, the Court affirms defendant's death sentence. Consequently, I dissent.

I

Without fully understanding the ramifications of his request, defendant asked to absent himself from the penalty-phase pro-

ceedings. The trial court, without conducting a *voir dire* of defendant, ensuring that defendant's decision was knowing and voluntary, or securing a written waiver, swiftly granted defendant's request. The court's response was utterly inadequate, and it precluded defendant from validly waiving his right to be present at the penalty phase of his capital trial.

The colloquy during which the court permitted defendant to absent himself from the penalty-phase proceedings occurred as follows:

DEFENSE COUNSEL: Mr. Morton has also requested that I, once again, indicate to the Court that he does not desire to be present during the penalty phase of the case. We have, Mr. Morton has exited the courtroom on several occasions, he has also been appraised by the Court of his various rights, and also, of his discretion not to be present during any aspect of the proceeding. I have gone over those rights once again with Mr. Morton, and he has asked that I, once again, request that he be excused during the penalty phase of the case, although understanding that in the event there is a verdict in the case, or in essence, a sentence decided upon by the Jury, he will be required then to appear.

THE COURT: Okay, and you've heard what Mr. Call has said, correct, Mr. Morton?

THE DEFENDANT: That is correct.

THE COURT: And do you wish to be not in the courtroom during the proceedings on the penalty?

THE DEFENDANT: That is correct.

THE COURT: Okay, sir. All right. That is understandable, I know you've talked it over with your lawyer, the advantages and disadvantages of that, and I take it to be your decision, which represents a knowing and intelligent waiver of your right to be present, and I will honor your request.

Despite the trial court's conclusion, this colloquy failed to establish that defendant's waiver was knowing and voluntary.

I agree with the Court's holding that defendant's presence right is fundamental and that the waiver of that right must be knowing and voluntary. *See ante* at 440–41, 715 *A*.2d at 257–58; *see also Johnson v. Zerbst*, 304 *U.S.* 458, 464, 58 *S.Ct.* 1019, 1023, 82 *L. Ed.* 1461, 1466 (1938) (requiring waivers of fundamental rights to be knowing and intelligent); *State v. Buonadonna*, 122 *N.J.* 22, 35, 583 *A*.2d 747 (1991) (requiring waivers of fundamental rights to be knowing and voluntary); *Campbell v. Wood*, 18 *F*.3d 662, 672 (9th Cir.1994) (requiring waiver of defendant's right to be present at

his capital trial to be knowing, voluntary, and intelligent), *cert. denied,* 511 *U.S.* 1119, 114 *S.Ct.* 2125, 128 *L. Ed.*2d 682 (1994). The majority concludes, however, that defendant's waiver was knowing and voluntary. *Ante* at 441, 715 *A.*2d at 258. I do not agree.

Waiving the right of presence at the penalty phase is as rare and as delicate a decision as waiving the right to counsel. The defendant and his counsel form the critical components of the defense team that fights for the defendant's life. When the defendant tries to sever himself or his counsel from that team, the consequence can be severe; disintegration of the defense team can increase the probability of a death sentence. The right to counsel is a fundamental right that cannot be relinquished without an extensive *voir dire* and an on-the-record waiver. *E.g., Buonadonna, supra,* 122 *N.J.* at 35, 583 *A.*2d 747. The parallel right to presence at the penalty phase must likewise receive similar safeguards against unknowing or involuntary waiver.

Accordingly, when a capital defendant asks to absent himself from the penalty phase, trial courts must follow procedures similar to those utilized when defendants request to represent themselves. In the context of a defendant seeking self-representation, this Court wrote: " 'A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances.' " *State v. Crisafi,* 128 *N.J.* 499, 510, 608 *A.*2d 317 (1992) (quoting *Von Moltke v. Gillies,* 332 *U.S.* 708, 724, 68 *S.Ct.* 316, 323, 92 *L. Ed.* 309, 321 (1948)). When a capital defendant moves to waive his right of presence at the penalty phase, the trial court must undertake a similarly probing examination. *See Amaya–Ruiz v. Stewart,* 121 *F.*3d 486, 496 (9th Cir.1997) (upholding death sentence despite defendant's absence where court informed defendant of presence right and cautioned defendant that absence would be disadvantageous), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 1083, 140 *L. Ed.*2d 140 (1998); *Campbell, supra,* 18 *F.*3d at 672–73 (upholding death sentence despite defendant's absence where de-

fendant signed written waiver and defendant twice discussed with court his decision to be absent); *People v. Edwards,* 54 *Cal.*3d 787, 1 *Cal.Rptr.*2d 696, 819 *P.*2d 436, 450 (1991) (upholding death sentence despite defendant's absence because of oral and written waiver), *cert. denied,* 506 *U.S.* 841, 113 *S.Ct.* 125, 121 *L. Ed.*2d 80 (1992); *People v. Robertson,* 48 *Cal.*3d 18, 255 *Cal.Rptr.* 631, 767 *P.*2d 1109, 1134–35 (1989) (upholding death sentence despite defendant's absence because defendant signed written waiver), *cert. denied,* 493 *U.S.* 879, 110 *S.Ct.* 216, 107 *L. Ed.*2d 169 (1989); *Peede v. State,* 474 *So.*2d 808, 815 (Fla.1985) (upholding death sentence despite defendant's absence because trial court extensively questioned defendant in on-the-record proceedings at jail to determine if waiver was knowing and voluntary), *cert. denied,* 477 *U.S.* 909, 106 *S.Ct.* 3286, 91 *L. Ed.*2d 575 (1986). "The colloquy between the court and the defendant will test the defendant's understanding of the implications of the waiver, and will provide appellate courts with an objective basis for review." *Crisafi, supra,* 128 *N.J.* at 511, 608 *A.*2d 317. "[A] trial judge must engage in a searching inquiry with the defendant to determine whether his waiver is being made knowingly and voluntarily." *State v. Wiggins,* 291 *N.J.Super.* 441, 451, 677 *A.*2d 800 (App.Div.), *certif. denied,* 146 *N.J.* 568, 683 *A.*2d 1163 (1996). Furthermore, the court must inform the defendant of the disadvantages of being absent from the penalty phase. *Cf. ibid.* (holding waiver of right to counsel invalid because court made no attempt "to determine whether defendant understood the implications of waiving his right to an attorney"). By being absent from the penalty phase, defendant was not able to assist his attorneys with the preparation of mitigating evidence and the cross-examination of State witnesses, and he forfeited the opportunity to impact psychologically the jury through his presence.

"[C]ourts must indulge every reasonable presumption against the loss of" defendant's right to be present. *Illinois v. Allen,* 397 *U.S.* 337, 343, 90 *S.Ct.* 1057, 1060, 25 *L. Ed.*2d 353, 358 (1970); *see also State v. Norman,* 151 *N.J.* 5, 35, 697 *A.*2d 511 (1997) (presuming nonwaiver of fundamental rights); *State v. Reed,* 133

*N.J.* 237, 265, 627 *A.*2d 630 (1993) (same); *Buonadonna, supra,* 122 *N.J.* at 35, 583 *A.*2d 747 (same). Because the trial court permitted defendant to relinquish his presence right much too rapidly, that presumption was not overcome.

The trial court's impetuous acceptance of defendant's request to be absent from the penalty-phase proceedings fell far short of what was required to effectuate a valid waiver. The court merely asked defendant, through a leading question, if he wished not to be in the courtroom during the penalty phase. Without asking additional questions, the court surmised that defendant had knowingly and voluntarily waived his presence right. The court, finding defendant's conversation with counsel sufficient, never sought to ensure that defendant understood the ramifications of being absent from the penalty phase. The court's blind faith in defendant's comprehension of his absence was particularly problematic because, as mitigating evidence revealed, defendant has borderline intellectual functioning. Moreover, the court never scrutinized whether defendant's request was voluntary. That error was particularly egregious because defense counsel had previously moved to bar defendant's presence. During the guilt phase, defense counsel had moved *ex parte* and *in camera* to bar defendant from the penalty phase because he feared that defendant, if present, would be dangerous and undermine the presentation of mitigating evidence. In that *in camera* hearing, defense counsel raised the specter of defendant choking him while co-counsel presented mitigating evidence. In the aftermath of the *in camera* hearing, the court was on notice that counsel may have strongly pressured defendant to forsake his right of presence. Due to counsel's conflict of interest in this case, *see* discussion, *infra* at 483, 715 *A.*2d at 279, the need for the court to conduct a probing *voir dire* to establish the waiver's voluntariness was especially vital in this case. *See Norman, supra,* 151 *N.J.* at 35, 697 *A.*2d 511 (requiring on-the-record waiver and assurance of defendant's awareness of "potential hazards" when defendant seeks to relinquish right to conflict-free counsel); *State v. Bellucci,* 81 *N.J.* 531, 545, 410 *A.*2d

666 (1980) (same). Therefore, defendant's waiver of his right to be present at the penalty phase was invalid.

The Court, however, concludes otherwise. It disregards the presumption that defendant had not validly waived his fundamental right. Instead, the Court relies on dubious and circumstantial evidence in order to hold that defendant understood the implications of his being absent from the penalty-phase proceedings. The majority points to two other instances in which defendant waived his presence right to establish that defendant's waiver was knowing and voluntary. In my opinion, the prior waivers did not sufficiently inform defendant of the implications of not being present at the penalty phase or prove that defendant's waiver was voluntary.

Defendant's waiver of his presence during the guilt-phase deliberations cannot validate the waiver of his penalty-phase presence. Though the trial court apprised defendant of his rights to be present and to return to the courtroom in case he changed his mind, the court never revealed the ramifications of his waiver. The brief colloquy between the court and defendant did not divulge that defendant's absence during penalty-phase proceedings would prevent defendant from assisting counsel present mitigating evidence and cross-examine State witnesses and preclude defendant from having a psychological effect on the jury. Of course, the trial court cannot be faulted for not discussing those matters when defendant wanted to be absent from guilt-phase deliberations, a time when no evidence was presented and the jury usually remained in the jury room. Consequently, defendant's absence during the guilt-phase deliberations does not demonstrate the validity of his waiver of his right to be present during the penalty-phase proceedings.

Likewise, defendant's absence during part of jury selection does not show that defendant's waiver of his presence at the penalty phase was knowing and voluntary. When defendant requested to be absent during the remainder of jury selection, the court engaged in an extended colloquy with defendant. The court

informed defendant that his absence during a trial can be disadvantageous because it would prevent him from observing witnesses and "get[ting] a sense of the situation." The court added that defendant's presence during jury selection was less critical than at other points of the trial. The court also told defendant that he could withdraw his waiver of presence at any time. This colloquy failed to prove that defendant validly waived his right to be present at the penalty phase.

While it was more informative that the ensuing presence-waiver colloquies, the colloquy could not establish the validity of defendant's penalty-phase waiver for several reasons. The jury-selection-presence-waiver colloquy occurred over two and one-half months prior to defendant's request to be absent from the penalty phase. In the eleven weeks following the colloquy during jury selection, during which time defendant was tried for and convicted of capital murder, defendant may have forgotten the trial court's admonition, which did not seem particularly pertinent at the time the court made it.

In addition, the court never explicitly told defendant that his presence would permit him to assist counsel with the presentation of a defense and with the cross-examination of State witnesses. Though the court told defendant that his absence at trial would prevent him from observing testimony, defendant, hampered by borderline intellectual functioning, may not have inferred that his presence at trial would permit him to assist his attorneys.

Most importantly, the court never gave defendant any indication that his presence would have a psychological effect on the jury. Courts have recognized that a capital defendant's presence has an intangible psychological impact on the jury, which continually observes the defendant, whose life is in its hands, and his human qualities. *See United States v. Fontanez,* 878 *F.*2d 33, 38 (2d Cir.1989) (defendant's absence "deprived [him] of the 'psychological function' of his presence on the jury during a crucial phase of his trial"); *State v. Okumura,* 58 *Haw.* 425, 570 *P.*2d 848, 853 (1977) (holding defendants present at verdict exert psychological

influence upon juries); *cf. State v. Zola,* 112 *N.J.* 384, 429–30, 548 *A.*2d 1022 (1988) (holding defendant has right to allocution because "it bespeaks our common humanity that a defendant not be sentenced to death by a jury which never heard the sound of his voice" (internal quotations omitted)), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L. Ed.*2d 205 (1989). By permitting defendant to remain absent at the rendering of the penalty-phase verdict, the court permitted defendant to relinquish his presence right at its most crucial point.

"The presence of the accused is not a mere form. It is of the very essence of a criminal trial not only that the accused shall be brought face to face with the witnesses against him, but also with his triers.... And at no time in the whole course of the trial is this right more valuable than at the final step when the jury are to pronounce that decision which is to restore him to the liberty of a citizen, or to consign him to the scaffold or to a felon's cell in the state prison."

[*Commonwealth ex rel. Milewski v. Ashe,* 363 *Pa.* 596, 70 *A.*2d 625, 629 (1950) (quoting *Temple v. Commonwealth,* 77 *Ky.* 769, 771 (1879)) (ellipsis in original).]

The majority underestimates the import of the psychological impact of defendant's presence at the penalty phase. Defendant had a due process right to "exert a psychological influence upon the jury." *Larson v. Tansy,* 911 *F.*2d 392, 396 (10th Cir.1990).

A substantial right was affected by [the defendant's] being absent when the jury returned its verdict. Had he been present he could have insisted on a poll of the jury being taken. While the judge did ask the jury generally if this was their verdict, the members were not polled individually. [The defendant] was deprived of the right personally to confront the jury.... [The defendant's] absence at the return of the verdict was significant. The psychological distinction between a general poll in his absence, and an individual poll requiring each juror to assume the burden of his decision and affirm it in the defendant's presence is not a minor one.

[*Lee v. State,* 509 *P.*2d 1088, 1094 (Alaska 1973) (footnote omitted).]

*Accord Kimes v. United States,* 569 *A.*2d 104, 111 (D.C.1989) ("When a jury returns to the courtroom, faces the accused, and, typically, is subject to a poll of the verdict, the psychological influence of the eye-to-eye contact between juror and defendant may be significant enough to cause a juror to change his or her mind when outside the pressure of the jury room."); *see also Larson, supra,* 911 *F.*2d at 395–96 (holding defendant's erroneous absence at closing argument, jury instructions, and verdict was reversible error); *Wade v. United States,* 441 *F.*2d 1046, 1050–51

(D.C.Cir.1971) (holding defendant's absence at verdict was reversible error). Thus, the psychological effect of a defendant's presence can have an impact on the outcome of the penalty phase. Because the court never informed defendant of the benefits of his presence at the penalty phase, defendant's waiver was not knowing and, therefore, invalid.

The fact that defendant testified at the guilt phase does not nullify the psychological effect his penalty-phase presence may have had. Defendant was absent from the most crucial proceedings that determined whether defendant would be sentenced to death. Moreover, defendant's penalty-phase absence may have created the impression that he did not care whether he lived or died. Also, defendant forfeited the opportunity to look the jurors in the eyes when they announced the death verdict.

Moreover, in none of the presence-waiver colloquies did the trial court inquire into the voluntariness of defendant's request to be absent during the penalty-phase proceedings. The voluntariness of defendant's earlier waivers did not verify the voluntariness of the penalty-phase waiver. When defendant requested to be absent from jury selection and the guilt-phase deliberations, defense counsel had not previously urged the court to bar defendant from the courtroom for those proceedings. In contrast, defendant's request to absent himself from the penalty phase was preceded by defense counsel's *ex parte* and *in camera* motion to exclude defendant from the penalty-phase proceedings. Defense counsel's desire, motivated in part by counsel's personal fear for his own safety, to have defendant barred from the penalty-phase proceedings raised the possibility that counsel unduly influenced defendant to waive his right to be present at the penalty phase. The court erred by not specifically inquiring into whether defendant's wish to be absent from the penalty-phase proceedings was voluntary.

Therefore, defendant's waiver of his right to be present at the penalty phase was not knowing and voluntary. It is unlikely that defendant understood all the ramifications of his waiver. Defense counsel did not tell the court that he had discussed with defendant

the advantages and disadvantages of waiver. Although the court stated that defense counsel had disclosed to defendant the implications of waiver, the record neither supports nor contradicts that assumption. Defendant may have been aware that his absence would prevent him from assisting with the presentation of mitigating evidence or the cross-examination of State witnesses. But, defendant probably did not know that his presence would have a psychological effect by humanizing him in the perceptions of the jury. It is impossible to determine definitively whether an understanding of the psychological impact of his presence would have changed defendant's mind because the court, by its failure to probe defendant's knowledge and desires, left the record incomplete.

Defendant's inadequate waiver cannot be deemed harmless. "To hold his absence harmless would be too speculative. It would assume to reconstruct what might have eventuated had he been present, when that cannot truly be reconstructed with a degree of certainty essential to avoid the reasonable possibility of prejudice." *Wade, supra,* 441 *F.*2d at 1051. Defendant, armed with the knowledge that his presence would have a beneficial effect on the jury's perception of him, may have decided not to relinquish his right to be present at the penalty phase. Had defendant chosen to be present, the outcome of the highly subjective penalty phase could have differed. Perhaps one juror would not have voted to sentence defendant to death if defendant had been present throughout the penalty-phase deliberations or at the penalty-phase verdict. Thus, the trial court's expedited acceptance, without conducting a *voir dire* to determine if defendant's waiver was knowing and voluntary, of defendant's request to be absent from the penalty phase was plain error and requires reversal of defendant's death sentence.

## II

### A.

The absence of defendant at the penalty phase was compounded by defense counsel's incompetence. At the penalty phase, defense

counsel introduced no witnesses. Defense counsel's failure to call any defense witnesses is inexplicable and inexcusable. Defense counsel's performance was ineffective per se; accordingly, defendant's death sentence must be reversed.

Under the federal and State Constitutions, defendant has a right to receive the effective assistance of competent counsel. *Strickland v. Washington,* 466 *U.S.* 668, 686, 104 *S.Ct.* 2052, 2063, 80 *L. Ed.*2d 674, 692 (1984); *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). I agree with the Court that defendant's ineffective-assistance-of-counsel claim requires a showing that "counsel's performance was truly deficient, with such grievous errors that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment", *Buonadonna, supra,* 122 *N.J.* at 41, 583 *A.*2d 747 (internal quotations omitted), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty phase deliberations would have been affected substantially," *State v. Marshall,* 148 *N.J.* 89, 250, 690 *A.*2d 1 (1997) (*Marshall III* ), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 140, 139 *L. Ed.*2d 88 (1997). *See ante* at 431, 715 *A.*2d at 252. However, I depart from the Court's application of the legal standard. In my opinion, defendant has met his burden of proving that his counsel were ineffective at the penalty phase.

Counsel's failure to call any defense witnesses demonstrates the attorneys' ineffectiveness. "Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant ... [and] advocate the defendant's cause." *Strickland, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2065, 80 *L. Ed.*2d at 694.

Defense counsel's complete reliance on the mitigation book, which included a timeline of defendant's difficult childhood and defendant's medical and school records, fell far short of the standards of competence required of capital defense attorneys. Defense counsel had the duty to argue effectively that the jury should not sentence defendant to die.

> Defense counsel therefore has both the opportunity and the duty to present potentially beneficial mitigating evidence and to attempt to convince the sentencer

that, notwithstanding the defendant's guilt, he or she is a person who should not die. Once the defendant has been found guilty of a capital crime, a life sentence is counsel's only remaining advocacy goal. As an advocate for life, counsel must attempt to demonstrate that mitigating factors outweigh aggravating factors and must present the sentencer with the most persuasive possible case for mercy.

[Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 *N.Y.U. L.Rev.* 299, 318 (1983).]

*Accord Marshall III, supra,* 148 *N.J.* at 313, 690 *A.*2d 1 (Handler, J. dissenting) ("The role of counsel at the penalty phase of a capital trial ... requires counsel to construct a sympathetic picture of a defendant's character."); James M. Doyle, *The Lawyers' Art: "Representation" in Capital Cases,* 8 Yale *J.L. & Human.* 417, 426 (1996) ("Good capital lawyers collect all of the information—school records, medical history, family memories, the defendant's own accounts—that bear on the defendant's humanity. They then present this information in as compelling a form as possible in a 'case for life.'" (footnote omitted)); Welsh S. White, *Effective Assistance of Counsel in Capital Cases: the Evolving. Standard of Care,* 1993 *U. Ill. L.Rev.* 323, 360–61 (1993) ("[A] capital defense attorney's central mission is to present the defendant's 'case for life' through the introduction of mitigating evidence at the sentencing stage." (footnote omitted)); Bruce A. Green, *Lethal Fiction: The Meaning of "Counsel" in the Sixth Amendment,* 78 *Iowa L.Rev.* 433, 497 (1993) ("Most importantly, the defense lawyer's role at the sentencing proceeding calls for an unusual exercise of judgment in attempting to persuade the jury that the defendant should not be put to death."); Goodpaster, *supra,* 58 *N.Y.U. L.Rev.* at 338 ("At the penalty phase, defense counsel's role is no longer merely responsive. Instead, he must now present an affirmative case for the life of a person who has been convicted of a capital crime."). "In every case, the capital defendant's attorney should seek to 'humanize' the defendant." White, *supra,* 1993 *U. Ill. L.Rev.* at 361; *accord* Doyle, *supra,* 8 Yale *J.L. & Human.* at 426 ("Unless defense counsel act, their client's humanity will be obscured by the prosecutor's representation."); Goodpaster, *supra,* 58 *N.Y.U. L.Rev.* at 321 ("To ensure a meaningful penalty hearing in capital cases, it is essential that the

client be presented to the sentencer as a human being."); *id.* at 337 ("[C]ounsel must portray the defendant as a human being with positive qualities."). Defense counsel gravely breached their duty.

The fact that defense counsel presented some mitigating evidence does not demonstrate their effectiveness. Rather, the quality of the presentation of the evidence was vital. "When effectively presented, mitigating evidence can make a difference in any capital case." White, *supra,* 1993 *U. Ill. L.Rev.* at 365; *accord* Doyle, *supra,* 8 *Yale J.L. & Human.* at 433 (expressing need to present mitigating evidence vividly). Defense counsel's total reliance on the mitigation book to make defendant's case for life and humanize defendant was entirely inadequate. While the mitigation book presented useful evidence of defendant's troubled childhood, a mitigation expert never contextualized the evidence. The mitigation book was too abstract for the jury to comprehend and make meaningful use of the mitigating evidence. Without a mitigation expert, the defense had no ability to link defendant's difficult childhood to his psychological makeup as an adult. In the absence of a mitigation expert's testimony, the defense's presentation was lifeless and hollow. Counsel's failure to call a mitigation expert seems even more perplexing in light of the fact that a social worker, who presumably could have been called as a mitigation expert, assisted the defense's mitigation efforts.

Defense counsel's decision to call no defense witnesses reveals their utter lack of appreciation for the importance of a convincing and vivid presentation of mitigating evidence.

> Those who have tried capital cases have found that the competent presentation of [mitigating] evidence often results in sentences less than death. But the right to have any of the "diverse frailties of humankind" taken into account is meaningless if the accused is not provided with counsel capable of finding and effectively presenting mitigating circumstances.
>
> [Stephen B. Bright, *Counselor for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer,* 103 *Yale L.J.* 1835, 1865 (1994) (footnotes omitted).]

Defense counsel apparently failed to recognize that "there is empirical evidence that the quality of defense representation is an important factor in many cases." Green, *supra,* 78 *Iowa. L.Rev.*

at 498. *See also* Michael L. Perlin, *"The Executioner's Face Is Always Well–Hidden": The Role of Counsel and the Courts in Determining Who Dies,* 41 *N.Y.L. Sch. L.Rev.* 201, 202 (1996) ("An examination of the full range of death penalty cases that have been litigated in the past twenty years . . . suggests one undeniable truth: in an amazingly high number of cases, the most critical issue in determining whether a defendant lives or dies is the quality of counsel."); Bright, *supra,* 103 *Yale L.J.* at 1841 ("Whether death is imposed frequently turns on the quality of counsel assigned to the accused."); Note, *The Eighth Amendment and Ineffective Assistance of Counsel in Capital Trials,* 107 *Harv. L.Rev.* 1923, 1932 (1994) ("When defense counsel does not effectively challenge the prosecution's case, fails to put on a defense, and develops no mitigating evidence, a death sentence can seem inevitable."). A commentator explained why the quality of defense counsel's presentation of mitigating evidence is critical:

> The quality of defense representation is likely to matter in the sentencing stage of the vast majority of capital cases. Because of the breadth of the jury's discretion and the subjectivity of its decision, the imposition of a death sentence will rarely, if ever, be a foregone conclusion. Moreover, the quality of defense representation plays a critical role because of the vast range of information relevant to the sentencing decision that the jury can learn only through defense counsel's efforts and because of the jury's susceptibility to persuasive argument. Thus, in capital cases, more than any other class of criminal cases, the quality of representation will make a difference—and the difference will be between life or death for the accused.
>
> [Green, *supra,* 78 *Iowa, L.Rev.* at 499 (footnote omitted).]

Defense counsel's failure to call mitigation witnesses resulted in a half-hearted and lackluster presentation of mitigating evidence. In light of the understanding among capital defense lawyers that the vivid presentation of mitigating evidence is essential, counsel's performance was thoroughly deficient.

The Court, however, finds that defense counsel's decision to call no witnesses at the penalty phase may have been a strategic decision. *Ante* at 431–32, 715 *A.2d* at 252–53. I disagree. Due to the importance of a vibrant presentation of mitigating evidence, no strategic decision by defense counsel could justify their decision to present no witnesses. Consequently, no facts revealed at post-

conviction relief could excuse defense counsel's defective performance.

In addition, the majority points to the fact that jury did not unanimously reject five catch-all mitigating factors to illustrate defense counsel's effectiveness. *Ante* at 431–32, 715 *A.*2d at 252–53. That argument is fallacious. It assumes, without basis, that jurors nonunanimously found five mitigating factors because of, rather than in spite of, defense counsel's languid performance. It disregards the possibility that the strength of the mitigating evidence, rather than the quality of defense counsel, impelled jurors to find the mitigating factors. It fails to recognize that had defense counsel called witnesses at the penalty phase, the jury may have found mitigating factors unanimously or, more fundamentally, might not have unanimously sentenced defendant to death.

Therefore, I believe that defense counsel's performance at the penalty phase was deficient. *See State v. Savage,* 120 *N.J.* 594, 625, 577 *A.*2d 455 (1990) (holding defense counsel's penalty-phase performance deficient); *cf. Smith v. Stewart,* 140 *F.*3d 1263, 1271 (9th Cir.1998) (holding defense counsel's failure to call witnesses at penalty phase or introduce mitigating evidence constituted ineffective assistance of counsel); *Clabourne v. Lewis,* 64 *F.*3d 1373, 1387 (9th Cir.1995) (same); *Harris v. Dugger,* 874 *F.*2d 756, 764 (11th Cir.1989) (same); *State v. Hamilton,* 699 *So.*2d 29, 34 (La.1997) (holding, on direct appeal, defense counsel's failure to call witnesses at penalty phase or introduce mitigating evidence comprised ineffective assistance of counsel), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 1070, 140 *L. Ed.*2d 129 (1998). Because defense counsel introduced no witnesses at the penalty phase, defendant has established the first prong of the *Strickland/Fritz* test.

I also believe that defendant has demonstrated that the ineffective assistance of counsel prejudiced him, the second prong of the *Strickland/Fritz* test. Accordingly, defendant's ineffective-assistance-of-counsel claim is meritorious and compels reversal of the death sentence.

In my opinion, defense counsel's utterly inadequate performance requires a presumption that defendant was prejudiced. "When there are 'egregious shortcomings in the professional performance of counsel' a presumption of prejudice arises without inquiry into the actual conduct of the trial." *Marshall III, supra,* 148 *N.J.* at 312, 690 *A.*2d 1 (Handler, J., dissenting) (quoting *Fritz, supra,* 105 *N.J.* at 61, 519 *A.*2d 336); *accord State v. Jack,* 144 *N.J.* 240, 249, 676 *A.*2d 545 (1996) ("[W]hen the level of counsel's participation makes the idea of a fair trial a nullity prejudice need not be shown, it is presumed. If this category of ineffective assistance is established, a defendant is not required to show prejudice. That degree of deficient performance is tantamount to a complete denial of counsel." (citation omitted)). That presumption of prejudice is conclusive. *Fritz, supra,* 105 *N.J.* at 61, 519 *A.*2d 336. Defense counsel's failure to call any witnesses at the penalty phase was an egregious shortcoming that triggers the irrebuttable presumption of prejudice.

Even if prejudice is not presumed in this case, defendant establishes the second prong of the *Strickland/Fritz* test. To reiterate, a defendant alleging ineffective assistance of counsel at a capital sentencing proceeding establishes the prejudice prong of the *Strickland/Fritz* test if he shows that "there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty phase deliberations would have been affected substantially," *Marshall III, supra,* 148 *N.J.* at 250, 690 *A.*2d 1. In other words, "if a reasonable juror would have considered the material in his or her deliberative process, then vacation of the death sentence is required." *id.* at 310–11, 690 *A.*2d 1 (Handler, J., dissenting). Defense counsel's witness-free presentation of mitigating evidence undoubtedly prejudiced defendant.

The testimony of a mitigation expert could have affected the penalty-phase deliberations. The expert witness would have explained to the jury how defendant's difficult childhood or low intelligence or defendant's mother's irresponsible childrearing impacted on defendant's deathworthiness. Without the testimony of

a mitigation expert, the mitigating evidence was obscure and devoid of context. Though defense counsel, in the opening and closing statements, attempted to explain the import of the mitigating evidence, the jury, which had been instructed that counsel's arguments were not evidence, likely gave little weight to those statements. Consequently, defense counsel's inability to call any witnesses at the penalty phase prejudiced defendant. *See Marshall III, supra,* 148 *N.J.* at 310, 690 *A.*2d 1 (Handler, J., dissenting) ("Certainly, noncumulative, material mitigating evidence generates the real possibility that it would 'affect substantially' 'penalty phase deliberations.' "). In this case, it is possible that defendant was sentenced to death, not on the basis of his crime and his character, but because of his counsel's pale presentation of mitigating evidence.

Accordingly, defendant's death sentence lacks reliability. *See* Note, *supra,* 107 *Harv. L.Rev.* at 1934 (noting incompetent counsel can "undermine the reliability of the death sentence"). "Arbitrary results, which are all too common in death penalty cases, frequently stem from inadequacy of counsel. The process of sorting out who is most deserving of society's ultimate punishment does not work when the most fundamental component of the adversary system, competent representation by counsel, is missing." Bright, *supra,* 103 *Yale L.J.* at 1837. Defense counsel's performance at the penalty phase was completely incompetent. By presenting no witnesses, the jury was unable to understand and consider fully the mitigating evidence. At a minimum, defense counsel's ineffectiveness affected the penalty-phase deliberations. Moreover, it may have altered the outcome. "There is no excuse ... for executing capital defendants for whom the poor quality of trial counsel meant the difference between life and death." Green, *supra,* 78 *Iowa. L.Rev.* at 504.

Therefore, defense counsel's inept performance prejudiced defendant. Irrespective of whether prejudice is presumed, defendant's sentence should be reversed because his attorneys violated his constitutional right to effective assistance of counsel.

## B.

Furthermore, defense counsel were hampered by a conflict of interest. As recounted above, in the midst of the guilt phase, defense counsel moved *ex parte* and *in camera* to proscribe defendant's presence at the penalty phase. By attempting to ban their client from being present at the proceedings that would determine whether he would be sentenced to death, defense counsel's interests conflicted with defendant's interest to be present at the penalty phase. Notably, at the time of defense counsel's motion, defendant had not expressed on the record a desire to absent himself from the penalty-phase proceedings. Because at the hearing defense counsel did not inform the court that defendant wished to be absent from the penalty phase, defendant likely had yet to inform his attorneys that he did not want to attend his capital-sentencing proceedings.

Because a defendant's presence is typically beneficial, when defense counsel moves to compel their client's absence, a conflict of interest arises. When a defendant and defense counsel have conflicting interests, the court must, on the record, inform the defendant of the conflict and ensure that the defendant understands the conflict's implications. *Norman, supra,* 151 *N.J.* at 35, 697 *A.*2d 511; *Bellucci, supra,* 81 *N.J.* at 545, 410 *A.*2d 666. In a capital case, when the defendant's interests diverge from defense counsel's interests, the court must appoint standby counsel to represent the defendant's interests. *See State v. Martini,* 144 *N.J.* 603, 614–15, 677 *A.*2d 1106 (1996) (*Martini III* ) (requiring trial court to appoint standby counsel to represent defendant's interest in waiving post-conviction review), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 699, 136 *L. Ed.*2d 621 (1997). Unless the defendant knowingly and voluntarily waives his right to be represented by counsel unimpeded by a conflict, defendant's counsel is deemed ineffective. *Bellucci, supra,* 81 *N.J.* at 545, 410 *A.*2d 666.

In this case, the trial court did not appreciate the existence of a conflict of interest between defendant and his attorneys, who, rather than attempting to convince defendant to attend the penal-

ty-phase proceedings, sought to bar their client from the penalty phase. The court did not appoint standby counsel or secure a waiver of conflict-free counsel. Consequently, defense counsel's conflict of interest provides additional grounds for finding a violation of defendant's right to receive effective assistance of counsel.

### III

In a case, such as this one, in which the defendant is African American and the victim is white, the court must conduct a probing *voir dire* with respect to the venirepersons' racial attitudes. *See State v. Harris,* 156 *N.J.* 122, 234–38, 716 *A.*2d 458 (1998) (Handler, J., dissenting); *State v. Loftin,* 146 *N.J.* 295, 414–20, 680 *A.*2d 677 (1996) (Handler, J., dissenting); *State v. Long,* 119 *N.J.* 439, 507–13, 575 *A.*2d 435 (1990) (Handler, J., concurring in part and dissenting in part). I continue to believe that the failure to conduct a rigorous racial-bias *voir dire* in a cross-racial capital-murder case comprises reversible error. Even when not requested by the parties, the trial court's obligation to ensure an impartial jury and fundamental fairness commands the court to *voir dire* venirepersons rigorously regarding racial bias.

The court's racial-bias *voir dire* in this case was not adequate. For example, the court had the following colloquy with a potential juror:

Q: Do you feel the race of defendant should be a consideration in a homicide trial?

A: No.

Q: Do you feel you yourself are able to treat people fairly and equally, regardless of what the race is?

A: Yes, I do.

Q: We need you to respond verbally. I know you're nodding affirmatively, but we need to get your words down. The decedent—

A: Yes.

Q: —in this case is white, and the defendant is black. If Mr. Morton is found guilty, then this would be an interracial crime. Would that affect your ability to be fair and impartial?

A: No.

Although the court did ask prospective jurors whether race would affect their abilities to be fair and impartial, the court improperly elicited merely yes-or-no answers from the venirepersons. That was not sufficient.

This Court has acknowledged the need for a more extensive *voir dire* regarding racial prejudice.

> Racial prejudice may be either blatant and easy to detect or subtle and therefore more difficult to discern. A probing *voir dire* that elicits more than a "yes" or "no" response will aid the trial court in excusing prospective jurors for cause and will assist the defense in exercising its peremptory challenges.
>
> [*State v. Williams,* 113 *N.J.* 393, 428, 550 *A.*2d 1172 (1988) (*Williams II* ).]

The trial court's superficial *voir dire* was not capable of uncovering venirepersons' racial biases. In today's society, overt racism is frowned upon. Only the most rabid racists would be willing to express their prejudices to the court. Further, racism is often unconscious. A potential juror cannot communicate his or her biases of which he or she is unaware. Consequently, a court must ask indirect questions regarding racial bias that can reveal a prospective juror's racial prejudices.

This case had racial overtones. Carolyn Bennett testified that defendant, knowing that he had killed Eck, said that there was "one less cracker for him to worry about." During *voir dire,* the court was aware of defendant's utterance of the racial slur. The court should have recognized the relevance of race to this case and asked venirepersons several probing questions pertaining to racial prejudice. The magnitude of the court's error was intensified when Bennett testified on redirect examination that defendant disliked white people.

Because this case involved a cross-racial murder and because race was inextricably tied to the case, *State v. Ramseur,* 106 *N.J.* 123, 246, 524 *A.*2d 188 (1987), the trial court should have conducted a vigorous *voir dire* in respect of potential jurors' racial biases. Though the parties have not raised this issue, the court's failure to sufficiently probe the prospective jurors' racial attitudes requires reversal of defendant's death sentence. *See, e.g., Harris, supra,*

156 *N.J.* at 238–40, 716 *A.*2d 458 (Handler, J., dissenting) (concluding inadequate racial-bias *voir dire* was reversible error).

IV

"In a capital sentencing proceeding before a jury, the jury is called upon to make a highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves." *Turner v. Murray,* 476 *U.S.* 28, 33–34, 106 *S.Ct.* 1683, 1687, 90 *L. Ed.*2d 27, 35 (1986) (internal quotations omitted). In this case, the jury's sentencing judgment was contaminated by grave errors at the penalty phase. Without conducting an inquiry to determine whether defendant's request to be absent from the penalty phase was knowing and voluntary, the trial court erred when it immediately accepted defendant's request to be absent from the penalty phase. Consequently, defendant did not validly waive his right to be present at the penalty phase. The effects of defendant's absence were escalated by defense counsel's ineffectiveness. Counsel's inexplicable failure to call a single defense witness during the penalty phase prevented a reliable sentencing determination. In addition, defense counsel's interests were adverse from defendant's. Moreover, the court's insufficient racial-bias *voir dire* could not ensure that jurors' racial prejudices did not affect the highly subjective penalty-phase deliberations pertaining to the cross-racial murder for which defendant was sentenced to die. Individually and cumulatively, these errors require reversal of defendant's death sentence. I dissent.

*For affirmance*—Chief Justice PORITZ, and Justices POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*For reversal in part*—Justice HANDLER—1.